**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION | MDL 2724<br>16-MD-2724<br>HON. CYNTHIA M. RUFE |
| IN RE:  DIGOXIN CASES | LEAD CASE: 16-DG-27240<br>END-PAYER CASE: 16-DG-27242 |
| THIS DOCUMENT RELATES TO:<br><br>*ALL END-PAYER ACTIONS* | JURY TRIAL DEMANDED |
| AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES DISTRICT COUNCIL 37 HEALTH & SECURITY PLAN; THE CITY OF PROVIDENCE, RHODE ISLAND; DETECTIVES ENDOWMENT ASSOCIATION OF THE CITY OF NEW YORK; LOUISIANA HEALTH SERVICE & INDEMNITY COMPANY d/b/a BLUE CROSS AND BLUE SHIELD OF LOUISIANA AND HMO LOUISIANA, INC.; SELF-INSURED SCHOOLS OF CALIFORNIA; UNITE HERE HEALTH; and NINA DIAMOND, on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>        v.<br><br>IMPAX LABORATORIES, INC.; LANNETT CO., INC.; MYLAN INC.; MYLAN PHARMACEUTICALS, INC.; PAR PHARMACEUTICAL, INC.; and WEST-WARD PHARMACEUTICALS CORP.,<br><br>        Defendants. | |

<u>**CORRECTED[1]**</u>
<u>**CONSOLIDATED SECOND AMENDED END-PAYER CLASS ACTION COMPLAINT**</u>

---

[1] This complaint removes Twin Cities Pipe Trade Welfare Fund, which was inadvertently listed as a plaintiff.  In all other respects it is identical to the originally filed complaint.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**TABLE OF CONTENTS**

I.      NATURE OF THE ACTION ................................................................... 1

II.     ONGOING FEDERAL AND STATE INVESTIGATIONS .................... 5

III.    JURISDICTION AND VENUE ........................................................... 10

IV.     PLAINTIFFS ...................................................................................... 12

V.      DEFENDANTS .................................................................................. 18

VI.     CO-CONSPIRATORS ........................................................................ 20

VII.    INTERSTATE AND INTRASTATE TRADE AND COMMERCE .......... 20

VIII.   BACKGROUND OF THE GENERIC DRUG INDUSTRY ................... 21

        A.      Generic Drugs Are Commodity Products ................................ 21
        B.      Pricing in the U.S. Prescription Drug Industry ...................... 25

IX.     THE GENERIC DIGOXIN CONSPIRACY ........................................ 27

        A.      Congressional Responses to Generic Drug Price Increases .... 27
        B.      The Generic Digoxin Market .................................................. 29
        C.      Generic Digoxin Price Increases ............................................ 30
        D.      Defendants' Own Acknowledgments of Lack of Generic Drug
                Competition ............................................................................ 40
        E.      Defendants' Opportunities to Conspire on Digoxin ............... 43
        F.      Defendants' Concerted Efforts to Increase Prices for Generic Digoxin
                Yielded Supracompetitive Profits ........................................... 56
        G.      Factors Increasing the Market's Susceptibility to Collusion ... 57
                1.      Industry Concentration .............................................. 58
                2.      Barriers to Entry ....................................................... 59
                3.      Demand Inelasticity .................................................. 61
                4.      Lack of Substitutes .................................................... 62
                5.      Standardized Product with High Degree of Interchangeability .... 63
                6.      Inter-competitor Contacts and Communications ........ 64

X.      THE STATUTES OF LIMITATIONS DO NOT BAR PLAINTIFFS' CLAIMS .......... 73

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

|  | A. | The Statutes of Limitations Did Not Begin to Run Because Plaintiffs Did Not and Could Not Discover Defendants' Unlawful Conspiracy | 73 |
|  | B. | Fraudulent Concealment Tolled the Statutes of Limitations | 75 |
|  |  | 1. Active Concealment of the Conspiracy | 76 |
|  |  | 2. Plaintiffs Exercised Reasonable Diligence | 77 |
| XI. | CONTINUING VIOLATIONS | | 78 |
| XII. | DEFENDANTS' ANTITRUST VIOLATIONS | | 78 |
| XIII. | CLASS ACTION ALLEGATIONS | | 80 |
| XIV. | CAUSES OF ACTION | | 85 |
|  | FIRST COUNT:  Violation of Sections 1 and 3 of the Sherman Act (on behalf of Plaintiffs and the Nationwide Class) | | 85 |
|  | SECOND COUNT:  (Violation of State Antitrust Sttutes (on behalf of Plaintiffs and the Damages Class) | | 87 |
|  | THIRD COUNT:  Violation of State Consumer Protection Statutes (on behalf of Plaintiffs and the Damages Class) | | 109 |
|  | FOURTH COUNT:  Unjust Enrichment (on behalf of Plaintiffs and the Damages Class) | | 147 |
| XV. | PRAYER FOR RELIEF | | 172 |
| XVI. | JURY DEMAND | | 174 |

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

## I.   <u>NATURE OF THE ACTION</u>

1.     This suit brings claims on behalf of indirect purchasers of generic Digoxin ("End-Payers" or "Plaintiffs") for injunctive relief and to recoup overcharges that resulted from an unlawful agreement among Defendants to allocate customers, rig bids, and fix, raise and/or stabilize the prices of generic Digoxin.

2.     Digoxin is used to treat mild to moderate heart failure in adults, increase the heart contracting functions for pediatric patients with heart failure, and control the resting heart rate in adult patients with chronic atrial fibrillation. It is derived from the leaves of the digitalis (or foxglove) plant and was first described in medical literature around 1785. It is on the World Health Organization's ("WHO") list of essential medicines.[1] Digoxin must be taken daily and exactly as prescribed to be effective; failure to take Digoxin as prescribed can have catastrophic consequences.

3.     For years, competition among sellers of generic Digoxin kept prices stable, at low levels.  But starting in the fall of 2013, Defendants, who dominate the market for Digoxin, abruptly and inexplicably raised prices.  The price increases were extreme and unprecedented—according to the United States Congress, the average market price for a 250 mcg tablet of generic Digoxin increased by 884% between October of 2013 and April of 2014 and remain at elevated levels today.  In fact, the U.S. Government Accountability Office ("GAO") identified generic Digoxin as having "experienced an extraordinary price increase."[2]

---

[1] *See* WHO website, *available at* http://apps.who.int/medicinedocs/en/d/Js2253e/3.4.html#Js2253e.3.4.

[2] GAO Report to Congressional Requesters, *Generic Drugs Under Medicare* (Aug. 12, 2016) ("GAO Report"), at Appx. III, *available at* http://www.gao.gov/products/GAO-16-706

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

4.      The price increases imposed by Defendant manufacturers of generic Digoxin cannot be explained by supply shortages or any other market feature or shock.  Nor were they the result of unilateral business decisions.  Instead, the significant increases in the prices of Digoxin were the result of an illegal agreement among Defendants to fix prices.

5.      Defendants' unlawful and anticompetitive conduct in the Digoxin market is part of a larger conspiracy or series of conspiracies involving numerous generic pharmaceuticals and pharmaceutical manufacturers.

6.      Defendants' attendance at trade association meetings, conferences, and workshops provided ample opportunities to agree on Digoxin prices and allocate markets and customers for Digoxin.  As alleged below, Defendants implemented their conspiracy through numerous secret meetings and communications, including trade association meetings held by the Generic Pharmaceutical Association ("GPhA") (now the Association for Accessible Medicines), the National Association of Chain Drug Stores ("NACDS"), the Healthcare Distribution Management Association (now the Healthcare Distribution Alliance) ("HDA"), the Minnesota Multistate Contracting Alliance for Pharmacy ("MMCAP"), and Efficient Collaborative Retail Marketing ("ECRM"), among others.

7.      The market for Digoxin was highly conducive to collusion, as it was controlled almost exclusively by the Defendants and is subject to high barriers to entry, including substantial manufacturing costs and regulatory requirements.  Because Digoxin is a medically necessary product for which reasonable substitutes are not available and demand is inelastic, Defendants were able to raise prices in concert without suffering corresponding losses in sales volume.  Federal regulations require Defendants' Digoxin products to contain the same type and

2

amount of active pharmaceutical ingredient and to be therapeutically equivalent to one another. They are therefore interchangeable commodity products.  Interchangeability facilitates collusion, as cartel members can easily monitor and detect deviations from a price fixing or market allocation agreement.

8.      Because purchasers choose whose Digoxin product to buy based primarily on price, and unilateral price increases generally result in loss of market share, it would have been economically irrational for any one Defendant to dramatically raise its prices without assurance that its competitors would do the same.

9.      Extreme and unprecedented price increases in the generic drug industry—like those imposed by manufacturers of Digoxin—have prompted close scrutiny of the industry by the U.S. Congress, federal and state enforcement agencies, and private litigants.

10.     An ongoing criminal investigation by the Antitrust Division of the U.S. Department of Justice ("DOJ") has, to date, resulted in price-fixing guilty pleas from two senior executives at Heritage Pharmaceuticals, Inc. relating to the sale of Doxycycline Hyclate and Glyburide.  But DOJ has made clear that its "investigation is ongoing"[3] and the evidence uncovered during the course of its investigation into those drugs also "implicates…a significant number of the Defendants…[and] a significant number of the drugs at issue" in this Multidistrict Litigation.[4]

_____

[3] DOJ, Division Update Spring 2017 (Mar. 28, 2017), _available at_ https://www.justice.gov/atr/division-operations/division-update-spring-2017/division-secures-individual-and-corporate-guilty-pleas-collusion-industries-where-products

[4] Intervenor United States' Motion to Stay Discovery at 1-2 (May 1, 2017) (ECF No. 279).

3

11.     The Attorney General for the State of Connecticut ("Connecticut AG"), whose office has been pursuing an investigation of the generic drug industry parallel to that of DOJ, confirms that its price-fixing investigation extends "way beyond the two drugs and the six companies. Way beyond… We're learning new things every day."[5] There is "compelling evidence of collusion and anticompetitive conduct across many companies that manufacture and market generic drugs in the United States….[and] evidence of widespread participation in illegal conspiracies across the generic drug industry."[6]

12.     Manufacturers of generic Digoxin are implicated in these ongoing investigations; most of the Defendants named here, Lannett Co., Inc. ("Lannett"); Impax Laboratories, Inc. ("Impax"); Par Pharmaceutical, Inc. ("Par"); and Mylan Pharmaceuticals, Inc., have received a federal grand jury subpoena and/or an investigative demand from the Connecticut AG as part of the generic drug price-fixing investigations.

13.     As End-Payers in the chain of pharmaceutical distribution, Plaintiffs bear the brunt of Defendants' illegal conduct.  Plaintiffs have paid many millions of dollars more than they would have in a competitive market for generic Digoxin.

14.     Plaintiffs bring this action against Defendants on account of their past and ongoing violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3) and the state laws set forth below.  Plaintiffs bring this action both individually and on behalf of (a) a national injunctive class of persons or entities in the United States and its territories who indirectly

---

[5] *How Martinis, Steaks, and a Golf Round Raised Your Prescription Drug Prices*, Kaiser Health News (Dec. 21, 2016) *available at* http://www.thedailybeast.com/how-martinis-steaks-and-a-golf-round-raised-your-prescription-drug-prices

[6] Connecticut AG, Press Release (Dec. 15, 2016) *available at* http://www.ct.gov/ag/cwp/view.asp?Q=588538&A=2341

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

purchased, paid and/or provided reimbursement for some or all of the purchase price of generic Digoxin products manufactured by any Defendant, other than for resale, from October 1, 2013 to the present ("Class Period"), and (b) a damages class of persons or entities in the states and territories identified herein who indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price of generic Digoxin products manufactured by any Defendant, other than for resale, from October 1, 2013 to the present.

## II.   ONGOING FEDERAL AND STATE INVESTIGATIONS

15.     Now in its third year, the federal criminal investigation into generic drug price fixing has begun to bear fruit. On December 12 and 13, 2016, DOJ filed criminal charges against former Heritage executives Jeffrey Glazer (Chief executive officer ("CEO")) and Jason Malek (President). The government alleged that they conspired with others "to allocate customers, rig bids, and fix and maintain prices" of Glyburide and Doxycycline Hyclate in violation of the Sherman Act (15 U.S.C. § 1).[7]

16.     On January 9, 2017, Glazer and Malek pleaded guilty to those charges.[8]  Deputy Assistant Attorney General Brent Snyder of the Justice Department's Antitrust Division explained: "These charges are an important step in correcting that injustice and in ensuring that generic pharmaceutical companies compete vigorously to provide these essential products at a

---

[7] Information ¶ 6, *United States v. Glazer*, No. 2:16-cr-00506-RBS (E.D. Pa. Dec. 12, 2016) (ECF No. 1); Information ¶ 6, *United States v. Malek*, No. 2:16-cr-00508-RBS (E.D. Pa. Dec. 13, 2016) (ECF No. 1).

[8] *See* Tr. of Plea Hearing, *United States v. Glazer*, No. 2:16-cr-00506-RBS (E.D. Pa. Jan. 9, 2017) (ECF No. 24); *see also* Tr. of Plea Hearing, *United States v. Malek*, No. 2:16-cr-00508-RBS (E.D. Pa. Jan. 9, 2017) (ECF No. 24).

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

price set by the market, not by collusion."[9]   As they await sentencing, Glazer and Malek are

cooperating with DOJ's continuing investigation.   More criminal charges and guilty pleas are

expected to follow.[10]

17.   Although initial public disclosures suggested that the federal and state

investigations were focused on one or two drugs, it is now clear that both investigations are

much, much broader.   The investigations reportedly cover two dozen drugs and more than a

dozen manufacturers.[11]   Press reports indicate that "[t]he Department of Justice (DoJ) believes

price-fixing between makers of generic pharmaceuticals is widespread."[12]

18.   According to one report, prosecutors see the investigation of the generic drug

industry much like DOJ's antitrust probe of the auto parts industry, which has morphed into

DOJ's largest criminal antitrust probe ever.   *See In re Automotive Parts Antitrust Litig*., No.

2:12-md-02311 (E.D. Mich.).   As in that case, prosecutors expect "to move from one drug to

another in a similar cascading fashion."[13]

---

[9] DOJ Press Release (Dec. 14, 2016) *available at* https://www.justice.gov/opa/pr/former-top-generic-pharmaceutical-executives-charged-price-fixing-bid-rigging-and-customer

[10] *See, e.g.,* Eric Kroh, *Generic Drug Price-Fixing Suits Just Tip Of The Iceberg*, Law360 (Jan. 6, 2017) ("'Once somebody starts cooperating, it leads to many more indictments.'"), *available at* https://www.law360.com/articles/877707/generic-drug-price-fixing-suits-just-tip-of-the-iceberg

[11] David McLaughlin & Caroline Chen, *U.S. Charges in Generic-Drug Probe to Be Filed by Year-End*, Bloomberg (Nov. 3, 2016) *available at* http://www.bloomberg.com/news/articles/2016-11-03/u-s-charges-in-generic-drug-probe-said-to-be-filed-by-year-end

[12] PaRR Report, *DoJ Believes Collusion over Generic Drug Prices Widespread* (June 26, 2015) ("PaRR Report"), *available at* http://www.mergermarket.com/pdf/DoJ-Collusion-Generic-Drug-Prices-2015.pdf

[13] *Id.*

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

19.     DOJ and a federal grand jury empaneled in the Eastern District of Pennsylvania have focused on at least seventeen generic drug manufacturers as part of the growing investigation, including: Actavis Holdco U.S., Inc. ("Actavis"); Aurobindo Pharma USA, Inc. ("Aurobindo"); Citron Pharma LLC ("Citron"); Dr. Reddy's Laboratories, Inc. ("Dr. Reddy's"); Heritage Pharmaceuticals, Inc. ("Heritage"); Impax; Lannett; Mayne Pharma, Inc. ("Mayne"); Mylan; Par; Perrigo New York, Inc. ("Perrigo"); Sandoz, Inc. ("Sandoz"); Sun Pharmaceutical Industries, Inc. ("Sun"); Taro Pharmaceuticals USA, Inc. ("Taro"); Teva Pharmaceuticals USA, Inc. ("Teva"); and Zydus Pharmaceuticals USA, Inc. ("Zydus").  And as recently as August 10, 2017, Pfizer, Inc. ("Pfizer") also disclosed that DOJ is investigating its Greenstone generics business.[14]

20.     The fact that these companies and/or their employees received subpoenas from a federal grand jury is significant.  DOJ does not empanel grand juries lightly.  The *Antitrust Division Manual* admonishes that "staff should consider carefully the likelihood that, if a grand jury investigation developed evidence confirming the alleged anticompetitive conduct, the Division would proceed with a criminal prosecution."  Accordingly, before a grand jury investigation proceeds, it requires a series of approvals, first by the relevant field chief, who then sends the request to the Antitrust Criminal Enforcement Division.  "The DAAG [Deputy Assistant Attorney General] for Operations, the Criminal DAAG, and the Director of Criminal

---

[14] Further discussion of the Defendants' receipt of subpoenas or other inquiries from DOJ is included *infra*.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Enforcement will make a recommendation to the Assistant Attorney General[,]" who must give final approval and authorize all attorneys who will participate in the investigation.[15]

21.     As Mark Rosman, former assistant chief of the National Criminal Enforcement Section of DOJ's Antitrust Division, noted in an article on the "unusual" nature of the criminal subpoenas, "A DOJ investigation into the alleged exchange of pricing information in the pharmaceutical industry likely indicates that the agency anticipates uncovering criminal antitrust conduct in the form of price-fixing or customer allocation."[16]

22.     Another significant indication of criminal price fixing in the generic drug industry is that DOJ has received assistance from a privately-held company that came forward as a leniency applicant:  "It is understood that Heritage is cooperating with prosecutors in exchange for amnesty from criminal prosecution under DOJ's leniency program[.]"[17]  As explained on DOJ's website, an applicant for amnesty "must admit its participation in a criminal antitrust violation involving price fixing, bid rigging, capacity restriction, or allocation of markets, customers, or sales or production volumes, before it will receive a conditional leniency letter." The applicant must also establish that "[t]he confession of wrongdoing is truly a corporate act, as opposed to isolated confessions of individual executives or officials."[18]

---

[15] DOJ, Antitrust Division Manual (5th ed. 2015) at Chapter III-81 to 83, *available at* http://www.justice.gov/atr/public/divisionmanual/chapter3.pdf

[16] Mark Rosman & Seth Silber, *DOJ's Investigation Into Generic Pharma Pricing Is Unusual,* Law360 (Nov. 12, 2014), *available at* https://www.wsgr.com/publications/PDFSearch/rosman-1114.pdf

[17] Richard Vanderford, *Generic Pharma Investigation Still Broad, Prosecutor Says*, mLex (Feb. 21, 2017).

[18] DOJ, *Frequently Asked Questions about the Antitrust Division's Leniency Program* (updated Jan. 26, 2017), *available a*t https://www.justice.gov/atr/page/file/926521/download

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

23.    In addition to the federal criminal investigation, the Connecticut AG began an investigation in July 2014 into the dramatic price increases in generic drugs.  Now joined by the Attorneys General ("AGs") of 43 other states and the District of Columbia, the Connecticut AG has filed a civil complaint in the U.S. District Court for the District of Connecticut alleging price fixing and customer allocation.[19]  Although the States' present complaint focuses on two drugs (doxycycline hyclate delayed release and glyburide), the States make clear that they have "uncovered wide-ranging conduct implicating numerous different drugs and competitors" and suggest that additional drugs and manufacturers will be added "at the appropriate time."[20]

24.    The publicly available version of the State AG Complaint is heavily redacted. Among the obscured portions are the contents of conspiratorial communications, which the Connecticut AG has described as "mind-boggling."[21]  The State AG Complaint explains that the generic drug industry is structured in a way that facilitates these types of collusive communications.  "Generic drug manufacturers operate, through their respective senior leadership and marketing and sales executives, in a manner that fosters and promotes routine and direct interaction among their competitors."  This affords them opportunities to "exploit their

---

[19] On August 3, 2017, the U.S. Judicial Panel on Multidistrict Litigation ("JPML") issued an order directing that the State AG case be transferred to this Court and coordinated as part of MDL 2724 (ECF No. 417).

[20] *State of Connecticut v. Aurobindo Pharma USA, Inc.*, No. 3:16-cv-2056 (VLB) (D. Conn.) (Doc. 168 at ¶ 9) (State AG Complaint).

[21] Mark Pazniokus, *How a small-state AG's office plays in the big leagues*, CT Mirror (Jan. 27, 2017), *available at* http://ctmirror.org/2017/01/27/how-a-small-state-ags-office-plays-in-the-big-leagues/

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

interactions at various and frequent industry trade shows, customer conferences and other similar events, to develop relationships and sow the seeds for their illegal agreements."[22]

25.     The criminal informations and guilty pleas relating to Glazer and Malek, the grand jury subpoenas, and evidence divulged in the State AG Complaint are merely the tip of the iceberg.   The government investigations have uncovered the existence of "a broad, well-coordinated and long-running series of schemes to fix the prices and allocate markets for a number of generic pharmaceuticals in the United States."[23] Plaintiffs do not yet have access to all of the information available to the government enforcement agencies.   What is known is that in light of the evidence described above, large and unprecedented price increases for generic Digoxin cannot be explained by normal, competitive market forces.    The explanation is collusion.

### III.    JURISDICTION AND VENUE

26.     Plaintiffs bring Count One of this action under Section 16 of the Clayton Act (15 U.S.C. § 26) for injunctive relief and costs of suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiffs and the members of the Classes described herein by reason of the violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

27.     This action is also instituted under the antitrust, consumer protection, and common laws of various states and territories for damages and equitable relief, as described in Counts Two through Four below.

---

[22] State AG Complaint ¶ 7.

[23] State AG Complaint ¶ 1.

10

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

28.     Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1337 and by Section 16 of the Clayton Act (15 U.S.C. § 26). In addition, jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1332(d) and 1367.

29.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22 and 28 U.S.C §§ 1391(b), (c) and (d); and 1407 and MDL Order dated April 6, 2017 (ECF No. 291), and because, during the Class Period, Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of the affected interstate trade and commerce described below has been carried out in this District. Venue is also proper in this District because the federal grand jury investigating the pricing of generic drugs is empaneled here and therefore it is likely that acts in furtherance of the alleged conspiracy took place here. According to DOJ guidelines, an "investigation should be conducted by a grand jury in a judicial district where venue lies for the offense, such as a district from or to which price-fixed sales were made or where conspiratorial communications occurred."[24]

30.     This Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant: (a) transacted business throughout the United States, including in this District; (b) sold Digoxin throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; (d) was engaged in an illegal scheme and nationwide price-fixing conspiracy that was directed at, had the intended effect of causing injury to, and did cause injury to persons residing in, located in, or doing business throughout the United States, including in this District; and/or (e) took overt action in furtherance of the conspiracy in this District or conspired with someone who did, and by doing so could reasonably

---

[24] DOJ, Antitrust Division Manual at III-83.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

have expected to be sued in this District. In addition, nationwide personal jurisdiction was authorized by Congress pursuant to the Clayton Act and by 28 U.S.C. § 1407.

## IV.    PLAINTIFFS

31.    Plaintiff American Federation of State, County and Municipal Employees District Council 37 Health & Security Plan ("DC 37") is a health and welfare benefit plan headquartered in New York, New York.  District Council 37 (the "Union") is New York City's largest public employee union.  The Union includes 51 local unions, representing public sector employees serving in thousands of job titles from Accountants to Zoo Keepers.  Members covered by DC 37's benefit plan work in almost every agency in New York City, including but not limited to the City's police and fire departments, hospitals, schools, libraries, social service centers, water treatment facilities, and city colleges.  DC 37 provides supplemental health benefits, including a prescription drug benefit, to approximately 313,000 individuals, including both active members and their families and 50,000 retirees, who reside in numerous locations in the United States. During the Class Period, DC 37 indirectly purchased and paid for some or all of the purchase price for one or more generic Digoxin prescriptions, other than for resale, manufactured by the Defendants.  Plaintiff made such payments and/or reimbursements in Alabama, California, Connecticut, Delaware, Florida, Georgia, Indiana, Kansas, Maine, Mississippi, New Hampshire, New Jersey, New York, North Carolina, Ohio, Pennsylvania, South Carolina, Virginia, and Puerto Rico, thereby suffering injury to its business and property.  During the Class Period, DC 37 paid and reimbursed more for these products than it would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers for those products.  As a result of the alleged conspiracy, DC 37 was injured in its

12

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

business or property by reason of the violations of law alleged herein.  DC 37 intends to continue purchasing and/or reimbursing for these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

32.     Plaintiff The City of Providence, Rhode Island ("Providence") is a municipal corporation.  Its principal office is located in Providence, Rhode Island.  Providence is a self-insured health and welfare benefit plan, and purchases, pays and/or provides reimbursement for its employees, retirees, and/or plan beneficiaries, who reside in numerous locations in the United States, for some or all of the purchase price of prescription drugs.  During the Class Period, Providence indirectly purchased, paid, and/or provided reimbursement for some or all of the purchase price for one or more generic Digoxin prescriptions, other than for resale, manufactured by the Defendants.  Providence made such payments and/or reimbursements in Florida, Massachusetts, New Hampshire, New York, Pennsylvania and Rhode Island, thereby suffering injury to its business and property. During the Class Period, Providence paid and/or reimbursed more for these products than it would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and/or stabilize the prices and allocate markets and customers for those products. As a result of the alleged conspiracy, Providence was injured in its business or property by reason of the violations of law alleged herein.  Providence intends to continue purchasing and/or reimbursing for these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

33.     Plaintiff Detectives Endowment Association of the City of New York ("DEA") is the second largest labor union representing police officers of the New York City Police Department.  The DEA was founded in 1917 to represent active and retired detectives of the

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

New York City Police Department.  The DEA represents 5,500 active and over 12,400 retired New York City Police Detectives who reside in numerous locations in the United States.  The DEA has its principal place of business in New York, New York.  During the Class Period, the DEA indirectly purchased and paid for some or all of the purchase price for one or more generic Digoxin prescriptions, other than for resale, manufactured by the Defendants. Plaintiff made such payments and/or reimbursements in Alabama, California, Colorado, Connecticut, Florida, Georgia, Louisiana, Maryland, Minnesota, Nevada, New Jersey, New York, North Carolina, Ohio, Oklahoma, Pennsylvania, South Carolina, Virginia and Wisconsin thereby suffering injury to its business and property. During the Class Period, the DEA paid and reimbursed more for these products than it would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers for those products. As a result of the alleged conspiracy, the DEA was injured in its business or property by reason of the violations of law alleged herein. The DEA intends to continue purchasing and/or reimbursing for these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

34.     Plaintiff Louisiana Health Service & Indemnity Company d/b/a Blue Cross and Blue Shield of Louisiana and HMO Louisiana, Inc. (collectively, "BCBS-LA") is headquartered in Baton Rouge, Louisiana, and is Louisiana's oldest and largest domestic health insurer, with over 1 million members.  During the Class Period, BCBS-LA indirectly purchased, paid, and/or provided reimbursement on behalf of its members for some or all of the purchase price for one or more generic Digoxin prescriptions, other than for resale, manufactured by the Defendants. Plaintiff made such payments and/or reimbursements in Alabama, Arizona, Arkansas, California,

14

Colorado, Delaware, Florida, Georgia, Idaho, Illinois, Indiana, Iowa, Kansas, Louisiana, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Jersey, New York, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, Tennessee, Texas, Utah, Virginia, Washington and Wyoming, thereby suffering injury to its business and property. During the Class Period, BCBS-LA paid and reimbursed more for these products than it would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers for those products. As a result of the alleged conspiracy, BCBS-LA was injured in its business or property by reason of the violations of law alleged herein. BCBS-LA intends to continue purchasing and/or reimbursing for these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

35.     Plaintiff Self-Insured Schools of California ("SISC") is a Joint Powers Authority under California law that serves the interests of California public school district members. It is headquartered in Bakersfield, California.  It provides health benefit plans to approximately 300,000 members who reside in numerous locations in the United States. During the Class Period, SISC indirectly purchased and paid for some or all of the purchase price for one or more generic Digoxin prescriptions, other than for resale, manufactured by the Defendants. SISC made such payments and/or reimbursements in Arizona, California, Colorado, Georgia, Hawaii, Idaho, Illinois,  Michigan, Minnesota, Missouri, Nevada, New Mexico, Oklahoma, Oregon, Texas, Utah and Washington thereby suffering injury to its business and property. During the Class Period, SISC paid and reimbursed more for these products more than it would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and

15

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

customers for those products. As a result of the alleged conspiracy, SISC was injured in its

business or property by reason of the violations of law alleged herein. SISC intends to continue

purchasing and/or reimbursing for these drugs and will continue to be injured unless the

Defendants are enjoined from their unlawful conduct as alleged herein.

36.     [INTENTIONALLY LEFT BLANK]

37.     Plaintiff Unite Here Health ("UHH") is a multi-employer trust fund composed of

union and employer representatives, whose mission is to provide health benefits that offer high

16

quality, affordable healthcare to its participants at a better value and with a better service than is otherwise available in the market. Headquartered in Aurora, Illinois, UHH has served union workers in the hospitality, food service, and gaming industries for the past several decades. During the Class Period, UHH indirectly purchased and paid for some or all of the purchase price for one or more generic Digoxin prescriptions, other than for resale, manufactured by the Defendants. Plaintiff made such payments and/or reimbursements in Arizona, California, Connecticut, Florida, Illinois, Indiana, Maryland, Massachusetts, Minnesota, Nevada, New Jersey, New York, Ohio, Pennsylvania, South Carolina, Texas, Utah, Virginia, and Wyoming. During the Class Period, UHH purchased and paid more for these products than it would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers for these products. As a result of the alleged conspiracy, Plaintiff UHH was injured in its business or property by reason of the violations of law alleged herein. UHH intends to continue purchasing and/or reimbursing for these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

38.      Plaintiff Nina Diamond ("Diamond") is an individual and resident of Atlantic Beach, New York.  During the Class Period, Diamond indirectly purchased generic Digoxin manufactured by the Defendants. She purchased Digoxin in New York for her personal use and was not reimbursed for her purchases, thereby suffering injury to her property.  During the Class Period, Diamond paid more for generic Digoxin than she would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers for generic digoxin.  As a result of the alleged conspiracy, Plaintiff Diamond was injured by reason of the violations of law alleged herein.  Diamond intends to continue

17

purchasing these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

## V.     DEFENDANTS

**Impax**

39.     Defendant Impax Laboratories, Inc. ("Impax") is a Delaware corporation that has its principal place of business in Hayward, California. Impax's generics division is called Global Pharmaceuticals ("Global"). Impax is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania.  During the Class Period, Impax sold generic Digoxin to customers in this District and other locations in the United States.

**Lannett**

40.     Defendant Lannett Company, Inc. ("Lannett") is a Delaware corporation that has its principal place of business in Philadelphia, Pennsylvania.  Lannett is registered with the Pennsylvania Department of State as a foreign corporation. During the Class Period, Lannett sold generic Digoxin to customers in this District and other locations in the United States.

**Mylan Defendants**

41.     Defendant Mylan Inc. is a Pennsylvania corporation with its principal place of business in Canonsburg, Pennsylvania.

42.     Defendant Mylan Pharmaceuticals, Inc. is a West Virginia corporation with its principal place of business in Morgantown, West Virginia.  It is a subsidiary of Mylan Inc. Mylan Pharmaceuticals Inc. is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania.

18

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

43.     Mylan Inc. and Mylan Pharmaceuticals Inc. are wholly-owned subsidiaries of Mylan N.V., a Dutch pharmaceutical company.  Unless addressed individually, Mylan Inc. and Mylan Pharmaceuticals, Inc. are collectively referred to herein as "Mylan."  During the Class Period, Mylan sold generic Digoxin to customers in this District and other locations in the United States.

**Par**

44.     Defendant Par Pharmaceutical, Inc. ("Par") is a New York corporation with its principal place of business in Chestnut Ridge, New York.  Par is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania.  Par is a wholly-owned subsidiary of Endo International plc ("Endo"), an lrish corporation with its principal place of business located in Dublin, Ireland and its U.S. headquarters located in Malvern, Pennsylvania.  In September of 2015, Endo completed an acquisition of Par Pharmaceuticals Holdings, Inc. and combined it with its existing generics subsidiary, Qualitest Pharmaceuticals ("Qualitest"), naming the segment Par Pharmaceutical, Inc.  In January of 2014, Par announced that it had entered into an exclusive United States supply and distribution agreement with Covis Pharma S.à.r.l. ("Covis") to distribute the authorized generic version of Covis's Lanoxin® (Digoxin) tablets. At that time, Par began selling and shipping Digoxin in this country.  Par sold generic Digoxin to customers in this District and other locations in the United States.

**West-Ward**

45.     Defendant West-Ward Pharmaceuticals Corp. ("West-Ward") is a Delaware corporation with its principal place of business in Eatontown, New Jersey. West-Ward is the

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

United States agent and subsidiary of Hikma Pharmaceuticals PLC ("Hikma"), a London-based global pharmaceutical company and is a manufacturer and distributor of generic Digoxin. During the Class Period, West-Ward sold generic Digoxin to customers in this District and other locations in the United States.

46.     Whenever reference is made in this Complaint to any act, deed or transaction of any corporation, the allegation means that the corporation engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's business or affairs.

## VI.   CO-CONSPIRATORS

47.     Various other persons, firms, corporations and entities have participated as co-conspirators with Defendants in the violations and conspiracy alleged herein. In order to engage in the violations alleged herein, these co-conspirators have performed acts and made statements in furtherance of the antitrust violations and conspiracies alleged herein.  Plaintiffs may amend this Complaint to allege the names of additional co-conspirators as they are discovered.

## VII.   INTERSTATE AND INTRASTATE TRADE AND COMMERCE

48.     During the Class Period, Defendants sold and distributed generic Digoxin in a continuous and uninterrupted flow of interstate commerce to customers throughout the United States, including in this District.

49.     Defendants' and their co-conspirators' conduct, including the marketing and sale of generic Digoxin, took place within the United States and has had, and was intended to have, a

20

direct, substantial, and reasonably foreseeable anticompetitive effect upon interstate commerce within the United States.

50.     Defendants' anticompetitive conduct occurred in part in trade and commerce within the states and territories set forth herein, and also had substantial intrastate effects in that, *inter alia*, retailers within each state and territory were foreclosed from offering less expensive generic Digoxin to Plaintiffs inside each respective state and territory. The foreclosure of these less expensive generic products directly impacted and disrupted commerce for Plaintiffs within each state and territory and forced Plaintiffs to pay supracompetitive prices.

## VIII.   BACKGROUND OF THE GENERIC DRUG INDUSTRY

### A.   Generic Drugs Are Commodity Products

51.     Approximately 88% of all pharmaceutical prescriptions in the United States are filled with a generic drug.[25] In 2015, generic drug sales in the United States were estimated at $74.5 billion.[26]

52.     According to the U.S. Food & Drug Administration ("FDA"), a generic drug is "the same as a brand name drug in dosage, safety, strength, how it is taken, quality, performance, and intended use."[27] Once the FDA approves a generic drug as "therapeutically equivalent" to a

---

[25] GPhA, *Generic Drug Savings in the U.S.* (2015) ("GPhA Report") at 1, *available at* http://www.gphaonline.org/media/wysiwyg/PDF/GPhA_Savings_Report_2015.pdf

[26] Connecticut AG, Press Release (Dec. 15, 2016), *available at* http://www.ct.gov/ag/cwp/view.asp?Q=588538&A=2341

[27] FDA Website, *available at* http://www.fda.gov/Drugs/InformationOnDrugs/ucm079436.htm#G

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

brand drug, the generic version "can be expected to have equal effect and no difference when substituted for the brand name product."[28]

53.     In a competitive market, generic drugs cost substantially less than branded drugs. The U.S. Congressional Budget Office ("CBO") estimates that, "[o]n average, the retail price of a generic drug is 75 percent lower than the retail price of a brand-name drug."[29]  And that may be conservative.  According to a Federal Trade Commission ("FTC") study, in a "mature generic market, generic prices are, on average, 85% lower than the pre-entry branded drug price."[30] Mature generic markets—like that of Digoxin—typically have several manufacturers that compete for sales, hence keeping prices in check.

54.     Generic drug price competition provides enormous savings to consumers, pharmacies, and other drug purchasers, as well as to private health insurers, health and welfare funds, and state Medicaid programs.  Indeed, one study found that the use of generic medicines saved the United States healthcare system $254 billion in 2014 alone, and $1.68 trillion between 2005 and 2014.[31]

55.     The significant cost savings provided by generic drugs motivated Congress to enact the Drug Price Competition and Patent Term Restoration Act of 1984, more commonly known as the "Hatch-Waxman Act" (Pub. L. No. 98-417, 98 Stat. 1585). The Act streamlines the regulatory hurdles that generic drug manufacturers have to clear prior to marketing and selling

---

[28] *Id.*

[29] CBO, *Effects of Using Generic Drugs on Medicare's Prescription Drug Spending* (Sep. 15, 2010), *available at* https://www.cbo.gov/publication/21800

[30] FTC, *Pay-For-Delay: How Drug Company Pay-offs Cost Consumers Billions* (Jan. 2010), *available at* http://www.ftc.gov/os/2010/01/100112payfordelayrpt.pdf

[31] GPhA Report at 1.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

generic drugs. Generic drug manufacturers may obtain FDA approval in an expedited fashion through the filing of an Abbreviated New Drug Application ("ANDA") that establishes that its product is bioequivalent to the branded counterpart.

56.    Since passage of the Hatch-Waxman Act, every state has adopted substitution laws requiring or permitting pharmacies to substitute generic drug equivalents for branded drug prescriptions (unless the prescribing physician specifically orders otherwise by writing "dispense as written" or similar language on the prescription).

57.    Because each generic is readily substitutable for another generic of the same brand drug, pricing is the main differentiating feature. As recognized by the FTC, "generic drugs are commodity products" and, as a consequence of that, are marketed "primarily on the basis of price."[32]  In a competitive market, generic manufacturers cannot significantly increase prices (or maintain high prices in the face of a competitor's lower price) without losing a significant volume of sales.

58.    It is well-established that competition among generic manufacturers drives down price.  Before generic drugs enter a market, the brand drug has a monopoly and captures 100% of sales.  When lower-priced generics become available, the brand drug quickly loses market share as purchasers switch to the less expensive alternatives.  Over time, the price of a generic drug approaches the manufacturers' marginal costs.  As illustrated in the following chart, the price of a generic drug tends to decrease as more generic drug manufacturers enter the market:

---

[32] FTC, *Authorized Generic Drugs: Short-Term Effects and Long-Term Impact* (Aug. 2011), *available at* http://www.ftc.gov/os/2011/08/2011genericdrugreport.pdf

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



Source: FDA analysis of retail sales data from IMS Health, IMS National Sales
Perspective (TM), 1999-2004, extracted February 2005

59.     When new entrants join a competitive generic market, they typically will price
their product below the prevailing market price in order to gain market share.   A recent
government report confirmed this phenomenon in interviews with generic manufacturers:
"manufacturers said that if a company is bringing a generic drug into an established drug market,
it typically offers a price that is lower than the current market price in order to build its customer
base. Manufacturers also said that as each new manufacturer enters an established generic drug
market the price of that generic will fall, with one manufacturer noting that it is typically a 20
percent price decline per entrant."[33]

60.     When there are multiple generic manufacturers in an established generic market—
as with generic Digoxin—prices should remain low and stable, and should not increase absent a
market disruption or, as is the case here, anticompetitive conduct.

_____

[33] GAO Report at 23.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

B.       **Pricing in the U.S. Prescription Drug Industry**

61.     In simple terms, the generic pharmaceutical supply chain flows as follows: Manufacturers sell drugs to wholesalers. Wholesalers sell drugs to pharmacies. Pharmacies dispense the drugs to consumers, who pay the full retail price if they are uninsured, or a portion of the retail price (*e.g.*, a co-pay or co-insurance) if they are insured.  The insured consumers' health plans then pay the pharmacies additional amounts that are specified in agreements between them and the pharmacies.  These agreements are sometimes arranged by middlemen known as Pharmacy Benefit Managers ("PBMs").

62.     Because the prices paid by purchasers of generic drugs differ at different levels of the market and most of the transactions occur between private parties according to terms that are not publicly disclosed, the price of a given drug is not always obvious.  Market-wide pricing for a given drug, however, may be observed through the Centers for Medicare & Medicaid Services ("CMS") survey of National Average Drug Acquisition Cost ("NADAC").  NADAC was "designed to create a national benchmark that is reflective of the prices paid by retail community pharmacies to acquire prescription . . . drugs."[34]  "NADAC is a simple average of the drug acquisition costs submitted by retail pharmacies."[35]  In effect, NADAC is "a single national average."[36]  Thus, NADAC is one way to track general price trends in the marketplace.

---

[34] CMS, Methodology for Calculating the National Average Drug Acquisition Cost (NADAC) for Medicaid Covered Outpatient Drugs at 5, *available at* https://www.medicaid.gov/medicaid-chip-program-information/by-topics/prescription-drugs/ful-nadac-downloads/nadacmethodology.pdf.

[35] *Id.* at 15.

[36] *Id.*

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

63.     While NADAC provides the average price level across all manufacturers of a given drug, other prices are manufacturer specific. Drug manufacturers typically report benchmarks—like WACs (Wholesale Acquisition Costs)—for their drugs, which are then published in compendia used by participants in the pharmaceutical industry. The benchmarks are not actual transaction prices; rather, they are the manufacturer's reported price. Accordingly, WAC prices do not take into account discounts that may be provided, *e.g.*, for volume sales.[37]

64.     The amount that an end-payer will pay a pharmacy for a generic drug typically is determined with reference to a benchmark or list price like a WAC. The end-payer pays the pharmacy an amount based on the manufacturer's list price for the drug, plus a small mark-up or dispensing fee. Over time, third-party payers and PBMs have learned that manufacturers' list prices for some generic drugs can be substantially higher than the actual costs incurred by certain pharmacies to acquire the drugs. As a consequence, end-payers were paying more than simply the acquisition cost plus a small amount.

65.     To combat this, some third-party payers and PBMs have implemented their own proprietary benchmark prices—Maximum Allowable Costs ("MACs")—that set the amounts they will pay pharmacies for some generic drugs. A MAC caps the amount that an end-payer

---

[37] Average Wholesale Price ("AWP") is another benchmark price that is used in the pharmaceutical industry. And QuintilesIMS's National Sales Perspectives ("NSP") is another measure of manufacturer specific pricing. NSP data "captures 100% of the total U.S. pharmaceutical market, measuring sales at actual transaction prices rather than using an average wholesale price" and includes sales by manufacturers into various outlets. IMS Institute for Healthcare Informatics, HSRN Data Brief: National Sales Perspectives at 1, *available at* https://www.imshealth.com/files/web/IMSH%20Institute/NSP_Data_Brief-.pdf.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

will pay a pharmacy for a given strength and dosage of a generic drug, regardless of the pharmacy's acquisition costs.

66.     Third-party payers and PBMs set the MAC of a drug based on several factors, one of which is believed to be the lowest acquisition cost in the market for that generic drug. So, for example, if there are three manufacturers offering the same generic drug at three different prices, a PBM or third-party payer might set the MAC price at or near the lowest of the three prices. A pharmacy could elect to buy from a manufacturer with a higher price, but upon resale to a customer of the PBM or third-party payer, the pharmacy would only be paid the MAC price. Drug purchasers always should have an incentive to buy the least expensive available drug. Because MAC prices further incentivize pharmacies to choose the lowest priced option, a generic manufacturer that increases its price for a drug should expect to lose sales to a competitor with a lower price. Consequently, in the absence of coordinated pricing activity among generic manufacturers, an individual manufacturer should not be able to significantly increase its price (or maintain a higher price in the face of a significantly lower competitor price) without incurring the loss of a significant volume of sales. A manufacturer can only raise its price if it knows its competitors will raise their prices, too, *e.g.*, if they are conspiring.

## IX.     THE GENERIC DIGOXIN CONSPIRACY

### A.     Congressional Responses to Generic Drug Price Increases

67.     Generic Digoxin is one of the drugs identified by GAO as subject to extraordinary price increases. Those increases led to investigations by the United States Congress.

27

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

68.     Congress raised concerns about the alarming price spikes for numerous generic pharmaceuticals.   These concerns were prompted by the very real hardship suffered by end-payers as a result of the unprecedented price increases.

69.     In the Fall of 2014, Senator Bernie Sanders ("Sanders") and Representative Elijah Cummings ("Cummings") requested information from manufacturers of ten drugs that had experienced extraordinary price increases.  Six of those drugs—including Digoxin— are now the subject of complaints in this MDL.[38]  Sanders and Cummings sent letters to Lannett, Par, Impax (via its generics division, Global), and West-Ward ("October Letters") asking for detailed information on the generic Digoxin price hikes, among others. In November of 2014, Senator Sanders conducted a hearing entitled, "Why Are Some Generic Drugs Skyrocketing in Price?" ("Senate Hearing"). Various witnesses discussed the price hikes for generic drugs, but none of the industry executives that were invited to testify—including Arthur Bedrosian ("Bedrosian"), the CEO of Lannett—appeared.[39]

70.     Sanders and Cummings followed up with a request to the Office of the Inspector General of the Department of Health & Human Services ("OIG"), asking it to investigate the effect that price increases of generic drugs have had on the Medicare and Medicaid programs.

---

[38] Senator Sanders, Press Release, *Congress Investigating Why Generic Drug Prices Are Skyrocketing* (Oct. 2, 2014), *available at* https://www.sanders.senate.gov/newsroom/press-releases/congress-investigating-why-generic-drug-prices-are-skyrocketing

[39] Senate Hearing (Nov. 20, 2014), *available at* https://www.help.senate.gov/hearings/why-are-some-generic-drugs-skyrocketing-in-priced

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

The OIG issued its report in December 2015, confirming that price increases for numerous generic drugs far out-stripped inflation.[40]

71.     In response to another Congressional request—this one from Senators Susan Collins, Claire McCaskill, Bill Nelson and Mark Warner—the United States Government Accountability Office ("GAO") issued a report in August 2016 entitled "Generic Drugs Under Medicare: Part D Generic Drug Prices Declined Overall, but Some Had Extraordinary Price Increases."[41] The GAO investigation confirmed that in a competitive market, generic drug prices decline and remain stable, absent shortages or other market disruptions.[42] And this was the case for most generics. But it identified numerous drugs that experienced "extraordinary" increases, which it defined as an increase of more than 100%.[43] Digoxin is one of them.

**B.     The Generic Digoxin Market**

72.     Digoxin is sold throughout the United States and its territories.

73.     The market for Digoxin is mature; generic versions have been on the market for years. In 2014 alone, Defendants' total revenue from sales of these products was approximately

███████ [44]

---

[40] HHS OIG, *Average Manufacturer Prices Increased Faster than Inflation for Many Generic Drugs* (Dec. 2015), *available at* https://oig.hhs.gov/oas/reports/region6/61500030.pdf

[41] GAO Report.

[42] *Id.* at 23-25.

[43] *Id.* at 1 & Appendix III.

[44] Revenue, unit sales, and effective prices are obtained from QuintilesIMS Inc. ("IMS Health"). IMS Health is the largest vendor of physician prescribing data in the United States and is widely relied upon in the pharmaceutical industry and elsewhere.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

74.     At all relevant times, Defendants had substantial market power with respect to generic Digoxin; their collective market share was approximately ▮▮▮   Defendants exercised this power to maintain supracompetitive prices for Digoxin without losing so many sales as to make the elevated price unprofitable.

75.     Through their market dominance, Defendants have successfully foreclosed the market to rival competition, thereby maintaining and enhancing market power and enabling Defendants to charge Plaintiffs supracompetitive prices for generic Digoxin.

**C.     Generic Digoxin Price Increases**

76.     There are no legitimate reasons or explanations for the unprecedented and dramatic price increases for Digoxin by Defendants.

77.     Until the last few years, generic Digoxin pricing was remarkably stable. That stability is reflected in the following chart submitted, as part of his testimony at the Senate Hearing:[45]

---

[45] Schondelmayer Testimony, *available at* http://www.help.senate.gov/imo/media/doc/Schondelmeyer.pdf.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



**Figure 12. Digoxin 0.25 mg Tablet (Lannett) Price per Day of Therapy:**
**(January 1, 2005 to December 31, 2013)**

78.     While this chart shows the stability of the prices of generic Digoxin over an eight

year period, it reflects only a portion of the price hikes for generic Digoxin that then occurred.

The October Letters referenced above noted that prices for generic Digoxin had increased

dramatically between October 2012 and June 2014 for the market as a whole:

| Drug | SKU | Average Market Price, October 2012 | Average Market Price, June 2014 | Cost Increase | Average Percentage Increase |
|------|-----|-----|-----|-----|-----|
| Digoxin | 125mcg tablet | $.11 | $1.06 | $0.95 | 839% |
| Digoxin | 250mcg tablet | $.11 | $1.10 | $0.99 | 884% |

These astounding price increases were caused by sudden and abrupt pricing changes made by

Lannett, West-Ward, and Impax that were followed by Par and Mylan when they entered the

31

market in 2014 and 2015, respectively. Pricing for .125 mg and .250 mg tablets of Digoxin increased by roughly tenfold, from $0.11 per tablet in October 2012 to between $1.06 and $1.10 per tablet by June 2014.

79.     NADAC data on generic Digoxin show average price increases that led to substantially higher prices for generic Digoxin products for the .125 mg tablet dosage of generic Digoxin (sold by Lannett, Impax, Par, West-Ward and Mylan) during the period from October 2012 to April 2015.



80.     The following chart, based on NADAC data, shows the pricing of the .250 mg tablet dosage of generic Digoxin (made by Lannett, West-Ward, Impax, and Mylan) during the period from October 2012 to mid-March 2015:

32



81.     WAC data for sales of Digoxin further reflect the price increases that have taken

place beginning in October of 2013 (all prices are rounded to the nearest cent):[46]

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage increase |
|---------|-----------|-----|---------|---------|------------------|---------------------|
| 0.125mg, 100 ct. | Lannett | 00527-1324-01 | $0.14 | $1.19 | 16-Oct-13 | 734% |
| 0.125mg, 100 ct. | Impax | 00115-9811-01 | $0.14 | $1.19 | 22-Oct-13 | 734% |
| 0.125mg, 100 ct. | Par | 49884-0514-01 | * | $1.19 | 17-Jan-14 | * |
| 0.125mg, 100 ct. | West-Ward | 00143-1240-01 | $0.16 | $1.19 | 14-Apr-14 | 638% |
| 0.125mg, 100 ct. | Mylan | 00378-6155-01 | * | $1.19 | 17-Nov-14 | * |

---

[46] Asterisks reflect periods where there were no WAC data available.

33

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage increase |
|---|---|---|---|---|---|---|
| 0.125mg, 1,000 ct. | Lannett | 00527-1324-10 | $0.12 | $0.99 | 16-Oct-13 | 738% |
| 0.125mg, 1,000 ct. | Impax | 00115-9811-03 | $0.12 | $0.99 | 22-Oct-13 | 738% |
| 0.125mg, 1,000 ct. | Par | 49884-0514-10 | * | $0.99 | 17-Jan-14 | * |
| 0.125mg, 1,000 ct. | West-Ward | 00143-1240-10 | $0.13 | $0.99 | 14-Apr-14 | 687% |
| 0.125mg, 1,000 ct. | Mylan | 00378-6155-10 | * | $0.99 | 17-Nov-14 | * |

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage increase |
|---|---|---|---|---|---|---|
| 0.25mg, 100 ct. | Lannett | 00527-1325-01 | $0.14 | $1.19 | 16-Oct-13 | 734% |
| 0.25mg, 100 ct. | Impax | 00115-9822-01 | $0.14 | $1.19 | 22-Oct-13 | 734% |
| 0.25mg, 100 ct. | Par | 49884-0494-01 | * | $1.19 | 17-Jan-14 | * |
| 0.25mg, 100 ct. | West-Ward | 00143-1241-01 | $0.16 | $1.19 | 14-Apr-14 | 638% |
| 0.25mg, 100 ct. | Mylan | 00378-6156-01 | * | $1.19 | 17-Nov-14 | * |

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage increase |
|---|---|---|---|---|---|---|
| 0.25mg, 1,000 ct. | Lannett | 00527-1325-10 | $0.12 | $0.99 | 16-Oct-13 | 738% |
| 0.25mg, 1,000 ct. | Impax | 00115-9822-03 | $0.12 | $0.99 | 22-Oct-13 | 738% |
| 0.25mg, 1,000 ct. | Par | 49884-0494-10 | * | $0.99 | 17-Jan-14 | * |

34

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage increase |
|---------|-----------|-----|---------|---------|------------------|---------------------|
| 0.25mg, 1,000 ct. | West-Ward | 00143-1241-10 | $0.13 | $0.99 | 14-Apr-14 | 687% |
| 0.25mg, 1,000 ct. | Mylan | 00378-6156-10 | * | $0.99 | 17-Nov-14 | * |

82.     As these tables show, WAC for Defendants' various dosages of Digoxin are highly coordinated. Lannett and Impax implemented extraordinary price-increases on the heels of each other, and West-Ward joined the increase approximately six months later.  When Par and Mylan joined the market, instead of competing on price in order to gain market share, they priced their products the same as Lannett, Impax and West-Ward.  Even today, Defendants' prices for generic Digoxin remain above competitive levels.  These supracompetitive prices could not have been sustained absent Defendants' agreement to fix prices.

83.     ████████████████████████████████████████████

████████ ███ ███████ █████ █████ █████ █████ █████ ████ █████ ████ ████ ████ ████

████████████████████████████████████████████████

████████:

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



36

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

84.     There were no reasonable competitive justifications for these abrupt shifts in pricing conduct. To the contrary, anticompetitive activity explains these skyrocketing prices. Richard Evans at Sector & Sovereign Research recently wrote: "[a] plausible explanation [for price increases of generic drugs, including generic Digoxin] is that generic manufacturers, having fallen to near historic low levels of financial performance, are cooperating to raise the prices of products whose characteristics – low sales due to either very low prices or very low volumes – accommodate price inflation."[47]

85.     These enormous price increases were not due to supply disruptions. Federal law requires that drug manufacturers report drug shortages.[48] Digoxin is not listed on the FDA's list of Current and Resolved Drug Shortages and Discontinuations Reported to FDA.  Digoxin also does not appear on any archived lists of the American Society of Health-System Pharmacists ("ASHP") Current Shortage Bulletins from July 3, 2012, through today, nor does it appear on the current list of ASHP Resolved Shortage Bulletins (which includes drug shortages dating back to August 2010).  None of the Defendants reported any drug shortages or supply disruptions to the FDA in explanation for the supracompetitive pricing of Digoxin.

86.     Other published reports confirm this. As stated at the website of the Generics and Biosimilars Initiative on August 29, 2014, "[a]t the time of the [Digoxin] price increases, the U.S. Food and Drug Administration had reported no drug shortages, there was no new patent or new formulation and Digoxin is not difficult to make. The companies have not yet provided an

---

[47] *See* Ed Silverman, *Generic Drug Prices Keep Rising, but is a Slowdown Coming?* Wall St. J.  (April 22, 2015), *available at*  http://blogs.wsj.com/pharmalot/2015/04/22/generic-drug-prices-keep-rising-but-is-a-slowdown-coming.

[48] FDA Safety and Innovation Act of 2012, Pub. L. No. 112-144, §§ 1001-1008, 126 STAT. 995, 1099-1108.

37

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

explanation for the price rise."[49] With regard to drug shortages, federal law requires drug manufacturers to report potential shortages to the FDA, the reasons therefor, and the expected duration of the shortage,[50] but no supply disruption was reported by the relevant Defendants with respect to Digoxin in the fall of 2013.

87.    The presence or absence of competitors in the marketplace also does not explain the substantial price increases of generic Digoxin. From October 2012 to around November 21, 2013, the NADAC average price of generic Digoxin was consistently around $0.11 for the .125 mg tablets and between $0.11 and $0.12 for the .250 mg tablets, despite the fact that for a portion of the period after West-Ward suspended production, Lannett and Impax were the only significant players in the market. West-Ward's return to the market in July 2013 also did not affect pricing. Indeed, throughout 2012 and through September 2013, as Dr. Schondelmeyer's chart shows, the price of generic Digoxin remained steady. Following the astronomical price increases in the fall of 2013, Par entered the market in early 2014 and Mylan entered the market in 2015, but prices did not fall even with the addition of new competitors. Pricing remains inflated to this day.

88.    The steep Digoxin price hikes have had a catastrophic effect on consumers. According to a December 2013 report:

> Bill Drilling, an owner of a pharmacy in Sioux City, Iowa, apologizes as he rings up a customer's three-month supply of the heart medicine Digoxin. The total is $113.12—almost 10 times the cost for the same prescription in August. Digoxin isn't a new

---

[49] *Lawyers look at new price hike for old drug,* (Aug. 28, 2014), *available at* http://www.gabionline.net/Generics/General/Lawyers-look-at-new-price-hike-for-old-drug.

[50] *See* FDA, *Frequently Asked questions about Drug Shortages*, *available at* http://www.fda.gov/Drugs/DrugSafety/DrugShortages/ucm050796.htm#q.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

miracle drug. . . . "I've been doing this since 1985, and the only direction that generics-drug prices have gone is down," Drilling says….

\*     \*     \*

"This is starting to create hardship," he says. Many of his customers fall into what is known as the Medicare "doughnut hole," a coverage gap in which patients pay 47.5 percent of branded-drug costs and 79 percent of a generic's price. Russ Clifford, a retired music teacher, learned Digoxin's cost had jumped more than fourfold when he picked up his 30-day supply in mid-November. Clifford and his wife have had to dip into savings to pay their rising pharmaceutical bills.[51]

89.    These massive price increases adversely affected patients' ability to purchase their Digoxin medications. An independent pharmacist described the hardship caused by the Digoxin price increases with this anecdote offered at the Senate Hearing:

A recent example from my own experience is the price of Digoxin—a drug used to treat heart failure. The price of this medication jumped from about $15 for 90 days' supply, to about $120 for 90 days' supply. That's an increase of 800%. One of my patients had to pay for this drug when he was in the Medicare Part D coverage gap in 2014. Last year, when in the coverage gap he paid the old price. This year he paid the new price. Needless to say, the patient was astounded, and thought I was overcharging him. The patient called all around to try to get the medicine at the old, lower price, but to no avail.[52]

90.    The overcharges resulting from Defendants' conduct are directly traceable through the pharmaceutical distribution chain to End-Payers. A manufacturer first sells the drug to direct purchaser wholesalers based on the listed WAC, minus applicable discounts.

---

[51] Bloomberg, *Surprise Generic Drug Prices Spike*, *available through subscription at* http://www.bloomberg.com/bw/articles/2013-12-12/generic-drug-prices-spike-in-pharmaceutical-market-surprise.

[52] Frankil Testimony, *available at* http://www.help.senate.gov/imo/media/doc/Frankil.pdf.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Wholesalers then sell the drug to pharmacies, which in turn sell the drugs to End-Payers. The WAC serves as the benchmark for prices throughout the distribution chain.

91.     Defendants' price increases for Digoxin resulted in corresponding increases to the prices paid by Plaintiffs and members of the proposed Classes. Corresponding increases in Digoxin's transactional prices demonstrate that increased WAC prices translate to increases in the prices paid by End-Payers.

**D.     Defendants' Own Acknowledgments of Lack of Generic Drug Competition**

92.     The collusion relating to generic Digoxin was also reflected in Lannett's, Impax's, and Par's own statements—in documents and in oral remarks at earnings calls.

93.     In a fourth quarter 2013 earnings call that occurred on September 10, 2013, Bedrosian announced Lannett's intention to increase prices and his expectations that his competitors would follow suit. Discussing the role of Lannett's Vice-President of Sales, Kevin Smith (one of the persons apparently subpoenaed by DOJ), Bedrosian said:

> We're not a price follower. We tend to be a price leader on price increasing and the credit goes to my sales vice president. He [Smith] takes an aggressive stance towards raising prices. He understands one of his goals, his objectives as a sales vice president is to increase profit margins for the company. And he's the first step in that process….**I am finding a climate out there has been changed dramatically and I see more price increases coming from our competing—competitors than I've seen in the past. And we're going to continue to lead. We have more price increases planned for this year within our budget. And hopefully, our competitors follow suit.** (Emphasis added.)

94.     In a subsequent earnings call, Bedrosian reported that Lannett's chief competitor had indeed heeded his call for price increases. In an earnings call on November 7, 2013—after the initial generic Digoxin price increases—Bedrosian noted, referring to Impax, that **"[w]e've**

had a recent price increase on the [generic Digoxin] product as well because we are now only 1 of 2 people in the market. And as a result, I expect that product to do very well." (Emphasis added).

95.     The very next quarter, Bedrosian expressed complacency about Par entering as a new competitor: "And we see Par as one of our rational competitors in the marketplace." As he went on to note, "we're not troubled by their pricing in the marketplace. Not at all."

96.     In a quarterly earnings call held on November 3, 2014, Bedrosian again expressed confidence that Lannett would not have to engage in price competition generally in the generic drug market. He said Lannett and its competitors were "less concerned about grabbing market share. We're all interested in making a profit, not how many units we sell." Bedrosian went on to discuss, *inter alia*, Par and Impax, saying: "**[T]he companies we're looking at here are not irrational players. I don't see them just going out and trying to grab market share**." (Emphasis added.) He also noted that Mylan was expected to enter the market, "but **Mylan is one of those rational competitors, so we're not really expecting anything crazy from them**." (Emphasis added.) He predicted that price increases would continue. But there is nothing "rational" in expecting new market entrants to eschew price competition and disavow market share.

97.     On February 4, 2015, in another quarterly earnings call, Bedrosian confirmed there would be a moratorium on price competition. He stated: "**I think you're going to find more capital pricing [in the generic marketplace], more—I'll say less competition, in a sense. You won't have price wars**." (Emphasis added.) In his view, "I just don't see the prices eroding like they did in the past."

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

98.    In competitive markets, when new competitors enter the market, it tends to lead to increased competition and lower prices. This is the "rational" or expected result and is well documented in the generic drug industry. Lannett's expectation that Impax, Par and Mylan, among others, would behave in exactly the opposite way suggests an agreement among them not to compete on price. Their subsequent conduct—raising prices, electing not to increase market share—further suggests the existence of such an agreement.

99.    Bedrosian has also been quoted as saying that "**[s]o whenever people start acting responsibly and raise prices as opposed to the typical spiral down of generic drug prices, I'm grateful. Because Lannett tends to be active in raising prices.**"[53] (Emphasis added.)  He referred to sending a "thank you note" to one of his "rational" competitors.[54]

100.    Frederick Wilkinson, the CEO of Impax, also spoke to this topic in a third quarter 2014 earnings call: "[W]e've done what most of the other generic competitors have done, we look at opportunities, we look at how competition shifts, we look at where there may be some market movement that will allow us to take advantages on price increases and we've implemented those…." Likewise, during a November 4, 2013 earnings call, former Impax President Carole Ben-Maimon ("Ben-Maimon"), when asked about her company's "huge price increase on Digoxin following Lannett's pricing action," responded that "[t]he price increase for dig[oxin] speaks for itself…." In a February 20, 2014 earnings call, she stated that "the market has been pretty stable enough . . . . **We're pretty comfortable that what we've done is rational and will result in ongoing profitability for that product.**" (Emphasis added.)

---

[53] *Lannett (LCI) Lawsuits Will Wipe Out The Equity Citron Research* (Jan. 17, 2017), available at http://www.valuewalk.com/2017/01/lannett-lci-citron-research/

[54] *Id.*

42

101.    In connection with its acquisition of Par, Endo said in a May 18, 2015 presentation that that "consolidation and maturation of competitors have stabilized the pricing environment" for generic pharmaceuticals in the United States.[55]

102.    On August 8, 2016, Par's President Paul Campanelli ("Campanelli") stated in response to a question about the generics environment: "[a]nd **typically you want to just be very careful about trying to go after too much share**.  You just have got to take a balanced approach." (Emphasis added).

### E.    Defendants' Opportunities to Conspire on Digoxin

103.    In order to be successful, collusive agreements require a level of trust among the conspirators. While this can be accomplished by one-on-one communications, collaboration is also fostered through industry associations, which facilitate relationships between individuals who should otherwise be predisposed to compete vigorously with each other.

104.    As alleged by the State AGs, "the defendants routinely coordinated their schemes through direct interaction with their competitors at industry trade shows, customer conferences and other events . . . ."[56]

105.    Defendants met through trade associations, including the GPhA, which describes itself as "the nation's leading trade association for manufacturers and distributors of generic prescription drugs, manufacturers of bulk active pharmaceutical chemicals, and suppliers of

---

[55] Endo Presentation, *available at* https://www.sec.gov/Archives/edgar/data/1593034/000119312515190908/d928010dex992.htm.

[56] Connecticut AG, http://www.ct.gov/ag/cwp/view.asp?Q=588538&A=2341.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

other goods and services to the generic industry."[57] Current "Regular Members" of the GPhA include Defendants Impax, Mylan, Par and West-Ward. Regular Members "are corporations, partnerships or other legal entities whose primary U.S. business derives the majority of its revenues from sales of (1) finished dose drugs approved via ANDAs; (2) products sold as authorized generic drugs; (3) biosimilar/biogeneric products; or (4) DESI products."[58]

106.    Several of Defendants' high-ranking corporate officers have served on GPhA's Board of Directors before and during the Class Period:

a.    **2012 Board of Directors**: Tony Mauro ("Mauro"), President of Mylan North America; and Carol Ben-Maimon ("Ben Maimon"), President, Impax Global Pharmaceuticals;

b.    **2013 Board of Directors**: Mauro ; and Ben-Maimon;

c.    **2014 Board of Directors**: Mauro; Ben-Maimon;

d.    **2015 Board of Directors**: Marcy McDonald ("McDonald"), Vice-President of Regulatory Affairs of Impax; Marcie McClintic Coates ("Coates"), Vice-President & Head of Global Regulatory Affairs for Mylan; and Tony Pera (Pera), President  of Par;

e.    **2016 Board of Directors**: McDonald; Heather Bresch ("Bresch"), CEO of Mylan; Pera.

---

[57] GPhA, http://www.gphaonline.org/about/the-gpha-association.

[58] GPhA, http://www.gphaonline.org/about/membership.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

107.    In addition, Glazer of Heritage, who pled guilty to federal criminal charges relating to price fixing and other anticompetitive activity concerning generic drugs, also served on GPhA's Board of Directors.

108.    Representatives from Defendants attended periodic meetings held by GPhA.[59] The following table lists some of the GPhA meetings attended by Defendants' employees:

| Meeting | Meeting Date & Location | Attendees |
|---|---|---|
| 2012 GPhA Annual Meeting Business Exposition | February 22-24, 2012 Orlando, Florida | Mylan, Par |
| 2012 GPhA Fall Technical Conference | October 1-3, 2012 Bethesda, Maryland | Impax (MacDonald), Lannett, Mylan (Coates), Par |
| 2013 GPhA Annual Meeting | February 20-22, 2013 Orlando, Florida | Impax, Mylan, Par |
| 2013 GPhA CMC Workshop | June 4-5, 2013 Bethesda Maryland | Impax, Lannett, Mylan, Par |
| 2013 GPhA Fall Technical Conference | October 28-30, 2013 Bethesda, Maryland | Impax (MacDonald), Lannett, Mylan (Dan Snider ("Snider"), Vice-President of Morgantown RD,) Carmen Shepard (Senior Vice-President, Global Policy & Regulatory, Caotes), Par |
| 2014 GPhA Annual Meeting | February 19-21, 2014 Orlando, Florida | Impax, Mylan, Par |

_____

[59] *See* GPhA, http://www.gphaonline.org/index.php/events/2013-annual-meeting-past-attendees; http://www.gphaonline.org/index.php/events/2014-annual-meeting-past-meeting-attendees; http://www.gphaonline.org/events/past-events/2012-gpha-fda-fall-technical-conference; http://www.gphaonline.org/events/past-events/gpha-2013-fall-technical-conference.

45

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

| Meeting | Meeting Date & Location | Attendees |
|---|---|---|
| 2014 GPhA CMC Workshop | June 3-4, 2014 Bethesda Maryland | Impax (Macdonald), Mylan (Snider) |
| 2014 GPhA Fall Technical Conference | October 27-29, 2014 Bethesda, Maryland | Impax (MacDonald), Lannett, Mylan (Coates), Par, West-Ward |
| 2015 GPhA Annual Meeting | February 9-11, 2015 Miami Beach, Florida | Impax, Mylan, Par, West-Ward |
| 2015 GPhA CMC Workshop | June 9-10, 2015 Bethesda, Maryland | Impax, Lannett, Mylan, Par, West-Ward |

109.   The NACDS is a national trade association representing chain community pharmacies.  Its members include generic drug manufacturers, wholesalers, and retail chain pharmacies. NACDS holds regular industry events, including annual and regional conferences, which Defendants and other generic drug manufacturers attended, including the annual Total Store Expo.

110.   The HDMA is a national trade association that represents "primary pharmaceutical distributors" which links the nation's drug manufacturers and more than 200,000 pharmacies, hospitals, long-term care facilities, and clinics.[60]  HDA holds regular conferences where its members, including generic drug manufacturers, meet to discuss various issues affecting the pharmaceutical industry.  HDMA members during the Class Period have included Defendants Par and Mylan.

_____

[60] HDA website, *available at* https://www.healthcaredistribution.org/about.

46

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

111.    According to its website, MMCAP is a "free, voluntary group purchasing organization for government facilities that provide healthcare services.  MMCAP has been delivering pharmacy and healthcare value to members since 1985.  MMCAP's membership extends across nearly every state in the nation, delivering volume buying power.  Members receive access to a full range of pharmaceuticals and other healthcare products and services; such as, medical supplies, influenza vaccine, dental supplies, drug testing, wholesaler invoice auditing and returned goods processing."

112.    According to its website, ECRM conducts Efficient Program Planning Sessions that are made up of one-on-one strategic meetings that connect decision makers in an effort to maximize time, grow sales, and uncover industry trends.  At annual meetings organized by ECRM, generic drug manufacturers have scheduled meetings with generic drug buyers at chain drug stores, supermarkets, mass merchants, wholesalers, distributors, and buy groups for independents.  Representatives of Defendants West-Ward and Par attended ECRM's Efficient Program Planning Sessions.

113.    As set forth below, meetings and events hosted by HDMA, NACDS, MMCAP, and ECRM were frequently held during the Class Period and attended by high-level representatives from each Defendant, including employees with price-setting authority.[61]

114.    ███████████████████████████████████████

████████████████████████████████████████████

---

[61] The allegations included in this section pertaining to the HDMA, MMCAP, NACDS, and ECRM are based in part upon documents produced to plaintiffs pursuant to subpoenas *duces tecum* issued in *In re Propranolol Antitrust Litigation*, No. 16-cv-9901 (S.D.N.Y.).

47

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



115.    On April 20-23, 2013, NACDS held its 2013 Annual Meeting at the Sands Expo Convention Center in Palm Beach, Florida. This meeting was attended by representatives from Defendants, who were key executives for generic drug sales and pricing:

a.    **Mylan**: Joe Duda ("Duda"), President; Robert Potter ("Potter"), Senior Vice-President of  National Accounts and Channel Development; Mauro; Jim Nesta ("Nesta"), Vice-President of Sales;

b.    **Par**: Holden; Campanelli; Michael Altamuro ("Altamuro"), Vice-President Marketing & Business Analytics.

116.    On June 2-5, 2013, HDMA held its 2013 Business Leadership Conference ("BLC") in Orlando, Florida. This meeting was attended by the following representatives from all six Defendants, who were key executives for generic drug sales and pricing:

---



PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

a.   **Impax:** Gary Skalski ("Skalski"), Director of Sales; William Ball ("Ball"), Senior National Account Manager; Danny Darnell ("Darnell"), Senior National Account Manager; Todd Engle, Senior Director, Sales Operations;

b.   **Lannett:** Smith; Grace Wilks, Director, Sales & Marketing; Tracy Sullivan ("Sullivan"), Director of National Accounts;

c.   **Mylan**: Janet Bell, National Accounts Director; Duda; Edgar Escoto ("Escoto"), National Accounts Director; Kevin McElfresh ("McElfrisch"), Executive Director, National Accounts; Nesta; Robert O'Neill ("O'Neill"), Vice-President; Sean Reilly ("Reilly"), Key Account Manager; John Shane, Director of National Trade Accounts; Gary Tighe ("Tighe"), National Accounts Director; Lance Wyatt ("Wyatt"), National Accounts Director; Peter Gargiulo ("Gargiulo"), Director, National Accounts; Christopher Neurohr, Director, National Accounts;

d.   **Par**: Holden; Sandra Bayer ("Bayer"), National Accounts Manager; and

e.   **West-Ward**: Mark Boudreau, Executive Director of National Sales; Paul Kersten, Vice-President, Sales & Marketing; Neal Gervais, National Account Director; John Kline, National Account Director; and Joseph Ruhmel, National Account Director.

117.   On August 10-13, 2013, NACDS held its 2013 Total Store Expo ("TSE") at the Sands Expo Convention Center in Las Vegas, Nevada. This TSE was attended by the following representatives from all six Defendants, who were key executives for generic drug sales and pricing:

49

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

a.  **Impax**: Chris Gerber, Director of Pricing and Contracts; Italo Pennella, Account Manager; Dan Rozmiarek, Account Manager;

b.  **Lannett**: Smith; Bedrosian; William Schreck, Chief Operating Officer ("COO");

c.  **Mylan**: Nesta; Mike Aigner ("Aigner"), Director, National Accounts; Duda; McElfresh; O'Neill; Potter; Wyatt; Matt Cestra, Senior Director Marketing; Rodney Emerson, Director, Pricing & Contracts; Escoto; Stephen Krinke, National Accounts Manager; Damon Pullman, West Regional Account Manager; Reilly;

d.  **Par**: Holden; Altamuro; Renee Kenney ("Kenney"), Senior Advisor Generic Sales; O'Connor; Rick Guillory ("Guillory"), Vice-President of National Accounts; Gerald Burton, Vice-President of National Account; and

e.  **West-Ward:** Gavaris; Sam Goodman; Tareq Darwazeh, National Accounts Sr. Manager; Paul Markowitz, Director, National Accounts.

118.  ██████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████

██  ████████████████████████████

██  ████████████████████

██  ████████████████████████████████

██████

50

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

119.    On April 26-29, 2014, NACDS held its 2014 annual meeting in Scottsdale, Arizona. This meeting was attended by the following representatives from Defendants, who were key executives for generic drug sales and pricing:

   a.    **Mylan**: Duda; Mauro; Potter; Rob O'Neill, Head of Sales;

   b.    **Par**: Holden; Campanelli; Kenney.

120.    On May 12-15, 2014, MMCAP held its National Member Conference in Bloomington, Minnesota.  At this conference, topics included "RFPs under consideration for Pharmacy," "contract evaluation," and "pharmaceutical price increases."  Also at this conference, a Heritage employee met in person and discussed price increase strategies with a number of different competitors and was able to personally confirm agreement to raise prices of at least one drug (Glyburide).

121.    On June 1-4, 2014, the HDMA held a BLC at the JW Marriott Desert Ridge in Phoenix, Arizona.  The meeting was attended by the following representatives from all six Defendants, who were key executives for generic drug sales and pricing:

   a.    **Impax:** Skalski; Darnell; Ball;

   b.    **Lannett:** Smith; Grace Wilks, Director, Sales and Marketing; Sullivan;

   c.    **Mylan**: Richard Isaac, Senior Manager, Strategic Accounts; Duda; Escoto; Nesta; Wyatt;

   d.    **Par**: Gargiulo; Bayer; O'Connor; and

   e.    **West-Ward:** Mark Boudreau, Executive Director of National Sales.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

122.    On August 23-26, 2014, NACDS held its 2014 TSE at the Boston Convention Center in Boston, Massachusetts. This TSE was attended by the following representatives from all six Defendants, who were key executives for generic drug sales and pricing:

a.    **Impax:** Chris Gerber, Director of Pricing and Contracts;

b.    **Lannett:** Smith; Sullivan;

c.    **Mylan**: Duda; Potter; Aigner; Mauro; Tighe; Wyatt;

d.    **Par**: Holden; Renee Kenney, Senior Advisor Generic Sales; Lori Minnihan, Manager, Pricing & Analytics; Warren Pefley, Director, National Accounts; Charles "Trey" Propst, Vice-President, National Accounts; Michael Reiney, Vice President, Sales; Jeremy Tatum, Demand Manager; and

e.    **West-Ward:** Gavaris; Sami Goodman, Marketing Manager; Joel Rosenstack ("Rosenstack"), Senior Director, Marketing; Doug Statler ("Statler"), Senior. Director, Head of Sales.

123.    On February 16-18, 2015 the National Pharmacy Forum ("NPF") took place at the Marriott Waterside Hotel & Marina in Tampa, Florida. The speaker topics included: "current pricing and spending trends"; "a critique of the rationale for high prices offered by manufacturers"; and "the U.S. pharmaceutical market and the ongoing changes within the pharmaceutical world," including "market trends." The NPF was attended by the following representatives of Defendants, who were key executives for generic drug sales and pricing:

a.    **Mylan:** Lee Rosencrance, District Manager; Martin Wingerter, Director of National Accounts; Jan Bell, Director of National Accounts; Mark Pittenger: Sr. Director of National Accounts; and

52

PUBLIC VERSION<br>REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

b.   **Westward:** Neal Gervais, National Account Director; Joseph Schrick, Director, National Accounts; and Mark Zampella. Director, National Accounts.

124.



125.   On April 25-28, 2015, NACDS held its 2015 annual meeting at The Breakers, Palm Beach, Florida. This meeting was attended by the following representatives from Defendants, who were key executives for generic drug sales and pricing:

a.   **Mylan**: Potter; Rob O'Neill, Head of Sales; Mauro; Tighe;

b.   **Par**: Altamuro; Holden; and

c.   **West-Ward:** Gavaris; Statler; Rosenstack.

126.   Defendants continued to regularly attend trade association meetings, conferences and events in 2015-16, including: (a) the June 7-10, 2015 HDMA BLC in San Antonio, Texas; (b) the June 9-10, 2015 GPhA meeting in Bethesda, Maryland; (c) the August 22-25, 2015 NACDS Total Store Expo in Denver, Colorado; (d)  the November 2-4, 2015 GPhA meeting in Bethesda, Maryland; (v) the February 8-10, 2016 NPF meeting in Scottsdale, Arizona; (e) the April 12, 2016 HDMA Eighth Annual CEO Roundtable Fundraiser in New York; (f) the April

53

16-19, 2016 NACDS 2016 Annual Meeting in Palm Beach, Florida; (g) the June 12-16, 2016 HDMA BLC in Colorado Springs, Colorado; and (h) the August 6-9, 2016 NACDS 2016 Total Store Expo in Boston, Massachusetts.

127.    As uncovered in the State AGs' ongoing investigation, at these various conferences and trade shows, representatives from Defendants, as well as other generic drug manufacturers, discussed their respective businesses and customers.  These discussions would occur at social events, including lunches, cocktail parties, dinners, and golf outings, that usually accompanied these conferences and trade shows.  Defendants' employees used these opportunities to discuss and share upcoming bids, specific generic drug markets, pricing strategies and pricing terms in their contracts with customers.[63]

128.    In conjunction with meetings at conferences and trade shows, representatives of generic drug manufacturers get together separately, in more limited groups, allowing them to further meet face-to-face with their competitors and discuss their business.  In fact, high-level executives of many generic drug manufacturers get together periodically for what at least some of them refer to as "industry dinners."[64]

129.    A large number of generic drug manufacturers, including Defendants Impax, Lannett, Mylan, Par, and West-Ward, are headquartered or have major offices in close proximity to one another in New Jersey and eastern Pennsylvania, giving them easier and more frequent opportunities to meet and collude.  For example, in January 2014, at a time when the prices of a number of generic drugs were reportedly soaring, at least thirteen high-ranking male executives,

---

[63] *See, e.g.*, State AG Complaint ¶¶ 50-52.

[64] *Id.* at ¶¶ 53-60.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

including CEOs, Presidents, and Senior Vice Presidents of various generic drug manufacturers, met at a steakhouse in Bridgewater, New Jersey.

130.    Generic drug manufacturer employees also get together regularly for what is referred to as a "Girls' Night Out" ("GNO"), or alternatively "Women in the Industry" meetings and dinners.   During these GNOs, meetings and dinners, these employees meet with their competitors and discuss competitively sensitive information.   Several different GNOs were held in 2015, including: (a) in Baltimore, Maryland in May, and (b) at the NACDS conference in August.

131.    Through these various interactions, Defendants' employees are often acutely aware of their competition and, more importantly, each other's current and future business plans. This familiarity and opportunity often leads to agreements among competitors to fix prices or to allocate a given market so as to avoid competing with one another on price.

132.    Defendants also routinely communicate and share information with each other about bids and pricing strategy.   This can include forwarding bid packages received from a customer (*e.g.*, a Request for Proposal or "RFP") to a competitor, either on their own initiative, at the request of a competitor, or by contacting a competitor to request that the competitor share that type of information.

133.    Additionally, Defendants shared information regarding the terms of their contracts with customers, including various terms relating to pricing, price protection, and rebates.   Defendants use this information from their competitors to negotiate potentially better prices or terms with their customers, which could be to the ultimate detriment of consumers.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

F.      **Defendants' Concerted Efforts to Increase Prices for Generic Digoxin Yielded Supracompetitive Profits**

134.    This meeting of the minds among the competing sellers of generic Digoxin assured them handsome profits. Bedrosian noted in the February 4, 2015 earnings call that Lannett "recorded the highest net sales and net income in our company's history." Gross profits in the first six months of the 2015 fiscal year were $158.8 million or 76% of net sales, compared with $42.3 million or 37% of net sales during the previous fiscal year. Generic Digoxin accounted for 23% of the company's revenues, and Lannett has acknowledged that it is highly dependent on price increases for revenue growth.

135.    Similarly, according to its 2015 Form 10-K filed on February 26, 2015 with the Securities & Exchange Commission ("SEC"), Impax's 2014 revenues were $596 million, compared to $511 million in 2013—a 17% increase. One of the primary factors in this growth was "higher sales of our Digoxin."[65]

136.    Similarly, on October 30, 2015, John Sheehan, Mylan's CFO, stated in an earnings call:

> With respect to gross margin, I guess I would start by pointing out that since 2010 our gross margins have increased from 45% up to the high end of the guidance range that we indicated we would be at this year of 55%.  So the gross margins have been sustained. They have steadily increased over the last five, six years.  . . . It also has been driven by the positive pricing environment that we've seen, especially over the last couple of years in North America.

---

[65] Impax Form 10-K (Feb. 26, 2025), *available at* http://d1lge852tjjqow.cloudfront.net/CIK-0001003642/c545ab21-aa3d-4426-a0b9-ba4373b6c213.pdf?noexit=true.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

137.   Defendants' agreement to inflate the prices of generic drugs led to increased revenue and higher profits – which was a motive for the conspiracy.  In addition, the burgeoning profits of the illegal scheme drove company share prices higher, which provided further motive to conspire.  For example, Lannett's stock price in October 2012 was under $5.  But by April of 2015, Lannett's share price had skyrocketed to more than $70, fueled by the inflated profits from generic drugs.  Bedrosian, the Lannett CEO, owned more than 600,000 shares of stock during this time frame, the value of which increased by tens of millions of dollars. Other Defendants' stock prices also exploded with the profits of their price-fixing scheme.  For example, the share prices of Mylan and Hikma approximately tripled between October 2012 and mid-2015.

138.   As Hikma's CFO stated in an earnings call on August 20, 2014 for the second quarter of 2014, "I don't know how many of you have covered U.S. generic companies. But when I look at competitors, I look at the -- most companies that are either U.S. based or have a strong position in the U.S. are doing very well the last few years.  So the market forces are changing, I believe, in the market."

### G.   Factors Increasing the Market's Susceptibility to Collusion

139.   Publicly available data on the generic Digoxin market in the United States demonstrate that it is susceptible to cartelization by Defendants. Factors that make a market susceptible to collusion include: (1) a high degree of industry concentration; (2) significant barriers to entry; (3) inelastic demand; (4) the lack of available substitutes for the goods involved; (5) a standardized product with a high degree of interchangeability between the products of cartel participants; and (6) inter-competitor contacts and communication.

57

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1.      **Industry Concentration**

140.    A high degree of concentration facilitates the operation of a cartel because it makes it easier to coordinate behavior among co-conspirators.  Here, Defendants control ▮ of the generic Digoxin market.

141.    As described above, in the United States generic Digoxin markets, the number of meaningful competitors has dwindled, creating conditions favorable to an effective cartel. The firms that currently control most of the market are Defendants. A graphic available at the website of one PBM[66] reflects this development with respect to the market for generic Digoxin:



142.    By the third quarter of 2013, the Digoxin market was an effective duopoly and new entrants in 2014 were perceived as "rational" competitors who would not disrupt the existing price structure.

143.    In fact, the combined market share of Defendants' generic Digoxin ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

---

[66] Optum, *Rising Generic Prices: What can be done?* (March 2, 2015), *available at* http://www. optum.com/resources/library /whatcanbedone.html.

58

144.     While the market for Digoxin is sufficiently concentrated to facilitate collusion, the years of low and stable pricing in the market establish that the number of manufacturers in the market was sufficient to drive competition. Absent collusion, prices would have remained at competitive levels.

145.     The magnitude of Defendants' price increases for Digoxin distinguishes them from non-collusive oligopolistic pricing.  Non-collusive oligopolistic pricing would be expected to proceed incrementally, as manufacturers test the waters to see if competitors will follow a price increase.[67]  But here the increases are extreme – jumping more than 700% in one fell swoop. Such extreme pricing moves are not rational in the absence of advance knowledge that competitors will join the increase.

### 2.     Barriers to Entry

146.     Supracompetitive pricing in a market normally attracts additional competitors who want to avail themselves of the high levels of profitability that are available. However, the presence of significant barriers to entry makes this more difficult and helps to facilitate the operation of a cartel.

147.     There are significant capital, regulatory, and intellectual property barriers to entry in the generic Digoxin markets that make such entry time-consuming and expensive.

---

[67] *See* Louis Kaplow, *Competition Policy and Price Fixing* at 262 (2013) (discussing why, in the absence of cost or supply shocks, oligopolists resist "sudden and sharp" price increases, and noting, among other things, that "oligopolsits may increase prices in smaller steps because they do not fully trust each other"). *See also* Richard Posner, *Antitrust Law* at 59 (2d ed. 2001) (discussing the various challenges faced by oligopolists when attempting to increase price and why rational economic behavior undermines the ability to effect large and parallel price increases).

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

148.    Par's own 2015 Form 10-K (cited above) states that its business is to develop and commercialize "generic drugs with limited competition, high barriers to entry and longer life cycles."

149.    Costs of manufacture, coupled with regulatory oversight, represent a substantial barrier to entry in the generic Digoxin market. This is reflected in West-Ward's having to shut down temporarily its New Jersey production facility for Digoxin and spend $39 million on remediation.  Likewise, Impax's 2015 Form 10-K (cited above) referenced FDA warning letters it received with respect to its manufacturing facilities in Hayward, California and Taiwan.

150.    Intellectual property costs can also be substantial, as reflected in Par's Digoxin licensing deal with Covis and Lannett's licensing arrangement with Jerome Stevens Pharmaceuticals, Inc.

151.    In addition to the significant out-of-pocket costs required to bring a drug to market, the approval process for generic drugs takes significant time. As Kansas Senator Jerry Moran commented on September 21, 2016 during Congressional hearings on the FDA's role in the generic drug market, "there are more than 4,000 generic drug applications currently awaiting approval, and the median time it takes for the FDA to approve a generic is now 47 months or nearly four years."[68] This significant delay for new market entrants effectively precludes new competition from eroding the supracompetitive prices imposed by the conspiracy.

---

[68] Sen. Moran, Statement (Sep. 21, 2016), *available at* http://www.appropriations.senate.gov/imo/media/doc/092116-Chairman-Moran-Opening-Statement.pdf

60

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

### 3.  Demand Inelasticity

152.    Price elasticity of demand is defined as the measure of responsiveness in the quantity demanded for a product as a result of change in price of the same product. It is a measure of how demand for a product reacts to a change in price. The basic necessities of life— food, water, and shelter—are examples of goods that experience nearly perfectly inelastic demand at or near the minimums necessary to sustain life.  In other words, a person on the verge of dying of thirst will pay almost anything for water.

153.    In order for a cartel to profit from raising prices above competitive levels, demand for the product must be sufficiently inelastic such that any loss in sales will be more than offset by increases in revenue on those sales that are made.  Otherwise, increased prices would result in declining sales, revenues, and profits as customers purchased substitute products or declined to buy altogether. Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

154.    Demand for Digoxin tablets is highly inelastic because it is a unique product. Digoxin is a unique compound that is used for the treatment of atrial fibrillation and heart failure. This usage has led it to being designated as an "essential medicine" by WHO.

155.    Thus, generic Digoxin is an excellent candidate for cartelization because price increases will result in more revenue, rather than less, provided that most or all manufacturers participate.

61

### 4.      Lack of Substitutes

156.    In the case of Digoxin, while other medications exist for the treatment of atrial fibrillation, many doctors, particularly geriatricians and general practitioners, see Digoxin as the primary medication for the treatment of this condition.

157.    Furthermore, other atrial fibrillation drugs have different mechanisms for treating atrial fibrillation that can be used as complements to, rather than substitutes for, Digoxin. For example, sodium and potassium channel blockers like Flecainide, Propafenone, or Sotalol, are used for controlling heart *rhythm* in patients with atrial fibrillation, while Digoxin is used to control heart *rates* in patients with atrial fibrillation.

158.    Even other heart rate controlling medications, such as beta blockers, are not ready substitutes for Digoxin tablets because they have different chemical and pharmacokinetic properties that may not make them suitable treatment options under many circumstances. One study published in the *Journal of the American College of Cardiology* found "that Digoxin is still a first-line alternative to control ventricular rate in patients with atrial fibrillation, particularly in cases with congestive heart failure and left ventricular systolic dysfunction."[69]

159.    In addition, branded versions of Digoxin tablets do not serve as economic substitutes for generic versions of these compounds because branded products generally maintain substantial price premiums over their generic counterparts, making them inapt substitutes even when generic prices soar.  For example, WAC pricing for Lanoxin (the branded version of Digoxin tablets) was $240.00 per 100 tablet bottle in August 2013, which was more than double

---

[69] Henrique H. Veloso & Angelo A.V. de Paola, *Beta-Blockers Versus Digoxin to Control Ventricular Rate During Atrial Fibrillation*, 45 J. Am. Coll. Cardiology 1905, 1906 (June 2005), http://content.onlinejacc.org/article.aspx?articleid=1136643.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

both Impax's and Lannett's WAC prices for Digoxin tablets around that time, which was $118.50 per 100 tablet bottle.[70]

160.    Thus, purchasers of Digoxin tablets are held captive to the supracompetitive prices that resulted from Defendants' conspiracy to fix prices and allocate markets and customers.

### 5.    Standardized Product with High Degree of Interchangeability

161.    A commodity-like product is one that is standardized across suppliers and allows for a high degree of substitutability among different suppliers in the market. When products offered by different suppliers are viewed as interchangeable by purchasers, it is easier for the suppliers to agree on prices for the goods in question and to monitor those prices effectively.

162.    Generic drugs of the same chemical composition are effectively commodity products because the primary mechanism through which they compete is price. When approving an ANDA, the FDA confirms that a generic drug product is bioequivalent to the branded version of the drug.  This allows pharmacists to substitute that generic for the branded counterpart, as well as for any other generic that also is bioequivalent to the branded product.

163.    The generic Digoxin made by the defendant manufacturers are each chemical compounds composed of the same raw materials; indeed, Bedrosian has commented that Defendants use many of the same suppliers. He also acknowledged the commodity nature of Lannett's generics business during a November 7, 2013 earnings call.

164.    Because Defendants' Digoxin tablets are AB-rated generics of Lanoxin, pharmacists are permitted to substitute them for Lanoxin.

--------

[70] Oppenheimer Equity Research, Lannett Company, Inc. (Feb. 7, 2014) at 2.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

165.    Moreover, because generic manufacturers generally spend little effort advertising or detailing their generic compounds (*i.e.*, the practice of providing promotional materials and free samples to physicians), the primary means for one generic manufacturer to differentiate its product from another generic competitor's is through price reductions.[71] The need to compete on price can drive producers of commodity products to conspire—as they did here—to fix prices.

### 6.    Inter-competitor Contacts and Communications

166.    As discussed above, Defendants' representatives met at conferences convened by customers and trade associations of customers (such as the ECRM and NACDS), private industry dinners, and similar events. Moreover, Defendants are members of and/or participants of the GPhA; thus, their representatives have many opportunities to meet and conspire at industry meetings. As noted in press reports, "prosecutors are taking a close look at trade associations as part of their investigation as having been one potential avenue for facilitating the collusion between salespeople at different generic producers."[72]

167.    In addition, as noted above, Lannett's Bedrosian has made significant assertions about how Lannett and its competitors view the competitive landscape for generic drugs, and that none of them will compete on price for the foreseeable future. Such statements also indicate inter-competitor contacts and communications.

168.    The State AG Complaint alleges that Defendants routinely coordinated their schemes through direct interaction with their competitors at industry trade shows, customer

---

[71] *See* CBO, *Promotional Spending for Prescription Drugs (Dec. 2, 2009), available at* https://www.cbo.gov/sites/default/files/111th-congress-2009-2010/reports/12-02-drugpromo_brief.pdf at 1.

[72] PaRR Report.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

conferences, and other events. For example, Defendants Glazer and Malek admitted at their guilty plea hearings to engaging in discussions and attending meetings with competitors, during which they reached agreements to allocate customers, rig bids and fix prices of Doxycycline Hyclate and Glyburide.

169.    DOJ's and the Connecticut AG's investigations, and the grand jury subpoenas and investigative demands that have issued in conjunction with them, focus on inter-competitor communications.  These types of communications are not unique or isolated, but are rampant; "[g]eneric drug manufacturers operate, through their respective senior leadership and marketing and sales executives, in a manner that fosters and promotes routine and direct interaction among their competitors."[73] The sheer number of companies implicated in the investigations highlights (including some of the Defendants here with specific respect to Digoxin) the prevalence in the generic drug industry of the types of contacts and communications that facilitate collusion:

(a)    **Actavis**: In February 2016, Actavis's former parent, Allergan plc, disclosed that it received a DOJ subpoena "seeking information relating to the marketing and pricing of certain of the Company's generic products and communications with competitors about such products."[74]

---

[73] State AG Complaint ¶ 7.

[74] Allergan, SEC 2015 Form 10-K (Feb. 26, 2016), at F-106, *available at* https://www.sec.gov/Archives/edgar/data/1578845/000156459016013478/agn-10k_20151231.htm

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

(b)     **Aurobindo**: Aurobindo has disclosed receipt of a subpoena relating to DOJ's generic drug investigation.[75] The company stated that it "received a subpoena in Mar[ch] 2016 requesting non-product specific information."[76]

(c)     **Citron**:  In December 2016, Aceto Corporation (which purchased Citron's generic drugs assets) disclosed that DOJ "executed a search warrant against the Company and also served a subpoena requesting documents and other information concerning potential antitrust violations in the sale of Glyburide, Glyburide/Metformin, and Fosinopril HCTZ products."  The Connecticut AG requested that Citron produce all documents produced to DOJ.[77]

(d)     **Dr. Reddy's**:  In November 2016, Dr. Reddy's disclosed that it received subpoenas from DOJ and the Connecticut AG "seeking information relating to the marketing, pricing and sale of certain . . . generic products and any communications with competitors about such products."[78]

(e)     **Heritage**:  As a private company, Heritage is not required to make public disclosures.  Nonetheless, in the wake of the criminal guilty pleas by two of its executives,

---

[75] Zeba Siddiqui, *India's Aurobindo shares hit nine-month low on US price-fixing lawsuit,* Reuters (Dec 16, 2016), *available at* http://www.reuters.com/article/us-aurobindo-pharm-stocks-idUSKBN1450DV

[76] Aurobindo Pharma, Ltd., BSE Disclosure (Dec. 16, 2016), *available at* http://www.bseindia.com/xml-data/corpfiling/AttachHis/3C8E03C7_A46F_4792_AED5_197E6961A77E_125855.pdf

[77] Aceto Corp., SEC Form 8-K, Ex. 99.5, *available at* https://www.sec.gov/Archives/edgar/data/2034/000157104916020771/t1600804_ex99-5.htm

[78] Dr. Reddy's, SEC Form 6-K (Nov. 10, 2016), *available at* http://www.drreddys.com/investors/reports-and-filings/sec-filings/?year=FY17

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Heritage confirmed that it is "fully cooperating" with DOJ[79] and press reports indicate that Heritage has applied to DOJ's leniency program seeking amnesty for a cartel violation.[80]

(f)      **Impax**:  In July 2014, Impax disclosed that it received a subpoena from the Connecticut AG concerning sales of generic Digoxin.[81]  In November 2014, Impax disclosed that an employee received a broader federal grand jury subpoena that requested testimony and documents about "any communication or correspondence with any competitor (or an employee of any competitor) in the sale of generic prescription medications."[82] In February 2016, Impax disclosed that it received a DOJ subpoena requesting "information and documents regarding the sales, marketing, and pricing of certain generic prescription medications. In particular… Digoxin tablets, terbutaline sulfate tablets, prilocaine/lidocaine cream, and calcipotriene topical solution."[83]

---

[79] Tom Schoenberg , David McLaughlin & Sophia Pearson, *U.S. Generic Drug Probe Seen Expanding After Guilty Pleas*, Bloomberg (Dec. 14, 2016), *available at* https://www.bloomberg.com/news/articles/2016-12-14/u-s-files-first-charges-in-generic-drug-price-fixing-probe

[80] *See supra* ¶ 22.

[81] Impax SEC Form 8-K (July 15, 2014), *available at* https://www.sec.gov/Archives/edgar/data/1003642/000143774914012809/ipxl20140715_8k.htm

[82] Impax SEC Form 8-K (Nov. 6, 2014), *available at* https://www.sec.gov/Archives/edgar/data/1003642/000119312514402210/d816555d8k.htm

[83] Impax, SEC 2015 Form 10-K (Feb. 22, 2016), at F-53, *available at* https://www.sec.gov/Archives/edgar/data/1003642/000143774916025780/ipxl20151231_10k.htm

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

(g)     **Lannett**: In July 2014, Lannett disclosed that it received a subpoena from the Connecticut AG relating to its investigation into the price fixing of Digoxin.[84] On November 3, 2014, Lannett disclosed that a Senior Vice President of Sales and Marketing was served with a grand jury subpoena "relating to a federal investigation of the generic pharmaceutical industry into possible violations of the Sherman Act." The subpoena also requested "corporate documents of the Company relating to communications or correspondence with competitors regarding the sale of generic prescription medications, but is not specifically directed to any particular product and is not limited to any particular time period."[85]   On August 27, 2015, Lannett further explained that DOJ sought, among other things, "communications or correspondence with competitors regarding the sale of generic prescription medications, and the marketing, sale, or pricing of certain products, generally for the period of 2005 through the dates of the subpoenas."[86]

(h)     **Mayne**:  On August 25, 2016, Mayne Pharma Group Limited (the parent of Mayne) disclosed that it was "one of numerous generic pharmaceutical companies to receive a subpoena…seeking information relating to marketing, pricing and sales of select generic products" and that it had received a subpoena from the Connecticut AG seeking similar

---

[84] Lannett Press Release (July 16, 2014), *available at* http://lannett.investorroom.com/2014-07-16-Lannett-Receives-Inquiry-From-Connecticut-Attorney-General

[85] Lannett, SEC Form 10-Q (Nov. 6, 2014) at 16, *available at* https://www.sec.gov/Archives/edgar/data/57725/000110465914077456/a14-20842_110q.htm

[86] Lannett, SEC Form 10-K (Aug. 27, 2015) at 18, available at http://www.sec.gov/Archives/edgar/data/57725/000110465915062047/a15-13005_110k.htm

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

information.[87]   On November 4, 2016, Mayne Pharma Group Limited issued a press release stating: "Previously on 28 Jun[e] 2016, Mayne Pharma Group Limited disclosed that it was one of several generic companies to receive a subpoena from the Antitrust Division of the US Department of Justice (DOJ) seeking information relating to the marketing, pricing and sales of select generic products. The investigation relating to Mayne Pharma is focused on doxycycline hyclate delayed-release tablets (generic) and potassium chloride powders."[88]

(i)   **Mylan**:  In February 2016, Mylan disclosed that it received a DOJ subpoena "seeking information relating to…generic Doxycycline" and a similar subpoena from the Connecticut AG seeking "information relating to…certain of the Company's generic products (including Doxycycline) and communications with competitors about such products."[89] On Nov. 9, 2016, Mylan disclosed that "certain employees and a member of senior management, received subpoenas from DOJ seeking additional information relating to the marketing, pricing and sale of our generic Cidofovir, Glipizide-metformin, Propranolol and Verapamil products" and that "[r]elated search warrants also were executed" in connection with DOJ's investigation.[90]

---

[87] Mayne Pharma, 2016 Annual Report (Aug. 25, 2016), at 75, *available at* https://www.maynepharma.com/media/1788/2016-mayne-pharma-annual-report.pdf

[88] Mayne Pharma, Update on DOJ Investigation (Nov. 4, 2016), *available at* http://asxcomnewspdfs.fairfaxmedia.com.au/2016/11/04/01798874-137879061.pdf

[89] Mylan, SEC 2015 Form 10-K (Feb. 16, 2016), at 160, *available at* https://www.sec.gov/Archives/edgar/data/1623613/000162361316000046/myl10k_20151231xdoc.htm

[90] Mylan SEC Form 10-Q, at 58 (Nov. 9, 2016), *available at* https://www.sec.gov/Archives/edgar/data/1623613/000162361316000071/myl10q_20160930xdoc.htm

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

(j)     **Par**:  In March 2015, Par disclosed that it received subpoenas from the Connecticut AG and DOJ relating to Digoxin and Doxycycline.[91]   In November 2015, Endo International plc, the parent company of Par, elaborated: "In December 2014, our subsidiary, Par, received a Subpoena to Testify Before Grand Jury from the Antitrust Division of the DOJ and issued by the U.S. District Court for the Eastern District of Pennsylvania.  The subpoena requests documents and information focused primarily on product and pricing information relating to Par's authorized generic version of Lanoxin (Digoxin) oral tablets and Par's generic doxycycline products, and on communications with competitors and others regarding those products. Par is currently cooperating fully with the investigation."[92] Endo also disclosed that in December 2015 it "received Interrogatories and Subpoena Duces Tecum from the State of Connecticut Office of Attorney General requesting information regarding pricing of certain of its generic products, including   Doxycycline   Hyclate,   Amitriptyline   Hydrochloride,   Doxazosin   Mesylate, Methotrexate Sodium and Oxybutynin Chloride."[93]

(k)     **Perrigo**:  On May 2, 2017, Perrigo disclosed that "search warrants were executed at the Company's corporate offices associated with an ongoing investigation by the

---

[91] Par Pharmaceuticals Companies, Inc., SEC 2014 Form 10-K (Mar. 12, 2015) at 37, *available at* https://www.sec.gov/Archives/edgar/data/878088/000087808815000002/prx-20141231x10k.htm

[92] Endo International plc, SEC Form 10-Q (March 31, 2016) at 30, *available at* https://www.sec.gov/Archives/edgar/data/1593034/000159303416000056/endp-3312016x10q.htm

[93] *Id.* at 31.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

U.S. Department of Justice Antitrust Division related to drug pricing in the pharmaceutical industry."[94]

(l)   **Pfizer:**  On August 10, 2017, Pfizer disclosed: "As of July 2017, the U.S. Department of Justice's Antitrust Division is investigating our Greenstone generics business. We believe this is related to an ongoing antitrust investigation of the generic pharmaceutical industry. The government has been obtaining information from Greenstone."[95]

(m)   **Sandoz**:  In March 2016, Sandoz and Fougera Pharmaceuticals Inc. (a wholly-owned subsidiary of Sandoz) "received a subpoena from the Antitrust Division of the US Department of Justice (DoJ) requesting documents related to the marketing and pricing of generic pharmaceutical products…and related communications with competitors."[96]

(n)   **Sun**:  On May 27, 2016, Sun Pharmaceutical Industries, Ltd. (the parent of Sun) stated in a filing with the National Stock Exchange of India that one of its U.S subsidiaries, namely Sun, "received a grand jury subpoena from the United States Department of Justice, Antitrust Division seeking documents…relating to corporate and employee records, generic

---

[94] Perrigo Press Release (May 2, 2017), *available at* http://perrigo.investorroom.com/2017-05-02-Perrigo-Discloses-Investigation

[95] Pfizer, SEC Form 10-Q (Aug. 10, 2017) at 37, *available at* https://investors.pfizer.com/financials/sec-filings/sec-filings-details/default.aspx?FilingId=12225193.

[96] Novartis 2016 Financial Report at 217, *available at* https://www.novartis.com/sites/www.novartis.com/files/ar-2016-financial-report-en.pdf

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

pharmaceutical products and pricing, communications with competitors and others regarding the sale of generic pharmaceutical products, and certain other related matters."[97]

(o) **Taro**:  In September 2016, Taro disclosed that the Company "and two senior officers" received DOJ subpoenas seeking documents relating to "generic pharmaceutical products and pricing, communications with competitors and others regarding the sale of generic pharmaceutical products, and certain other related matters."[98]

(p) **Teva**:  In August 2016, Teva disclosed that it received subpoenas from DOJ and the Connecticut AG seeking documents and other information "relating to the marketing and pricing of certain of Teva USA's generic products and communications with competitors about such products."[99]

(q) **Zydus**:  Press reports have stated the Zydus is a target of DOJ's generic drugs price-fixing investigation.[100]

---

[97] Sun Pharmaceuticals Indus., Ltd., BSE Disclosure (May 27, 2016), *available at* http://www.bseindia.com/xml-data/corpfiling/AttachHis/8E568708_8D00_472E_B052_666C76A4263D_081648.pdf

[98] Taro, SEC Form 6-K (Sept. 9, 2016), *available at* https://www.sec.gov/Archives/edgar/data/906338/000115752316006685/a51417528.htm

[99] Teva, SEC Form 6-K at 25 (Aug. 4, 2016), *available at* https://www.sec.gov/Archives/edgar/data/818686/000119312516671785/d187194d6k.htm

[100] *See* Rupali Mukherjeel, *US polls, pricing pressure may hit Indian pharma cos*, The Times of India (Nov. 8, 2016), *available at* http://timesofindia.indiatimes.com/business/india-business/US-polls-pricing-pressure-may-hit-Indian- pharma-cos/articleshow/55301060.cms

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

## X.   THE STATUTES OF LIMITATIONS DO NOT BAR PLAINTIFFS' CLAIMS

### A.   The Statutes of Limitations Did Not Begin to Run Because Plaintiffs Did Not and Could Not Discover Defendants' Unlawful Conspiracy

170.   Plaintiffs had no knowledge of the combination or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth herein, until (at the earliest) Defendants' disclosures of the existence of the government investigations and subpoenas. Prior to that time, no information in the public domain or available to Plaintiffs suggested that any Defendant was involved in a criminal conspiracy to fix prices for generic Digoxin.

171.   No information evidencing antitrust violations was available in the public domain prior to the public announcements of the government investigations that revealed sufficient information to suggest that any of the defendants was involved in a criminal conspiracy to fix prices for generic Digoxin.

172.   Plaintiffs are purchasers who indirectly purchased generic Digoxin manufactured by one or more Defendants. They had no direct contact or interaction with any of the Defendants in this case and had no means from which they could have discovered Defendants' conspiracy.

173.   Defendants repeatedly and expressly stated throughout the Class Period, including on their public Internet websites, that they maintained antitrust/fair competition policies which prohibited the type of collusion alleged in this Complaint. For example:

>        (a)   Impax's Code of Conduct provides: "Impax is committed to free and open competition in the marketplace, and requires employees to strictly adhere to the antitrust laws in the countries where we do business….   No employee may discuss with, or provide information to, any competitor

73

about pricing or related matters, whether the information concerns Impax or its suppliers, distributors, wholesalers or customers."[101]

(b)     Lannett's Code of Business Conduct and Ethics "promotes compliance with laws."[102]

(c)     Mylan's Code of Conduct and Business Ethics states: "Mylan is committed to complying with applicable antitrust and fair competition laws."[103]

(d)     Par's Code of Conduct provides: "It is Company policy to comply with the antitrust and competition laws of each country in which the Company does business."[104]

(e)     Hikma's (the parent of West-Ward) Code of Conduct provides: "Hikma will engage in free and fair competition and not seek competitive advantage through unlawful means. Hikma will not collude with competitors on prices, bids or market allocations, nor exchange information with third parties in a way that could improperly influence business outcomes."[105]

174.   It was reasonable for members of the Class to believe that Defendants were complying with their own antitrust policies.

175.   For these reasons, the statutes of limitations as to Plaintiffs' claims under the federal and state common laws identified herein did not begin to run, and have been tolled with respect to the claims that Plaintiffs have alleged in this Complaint.

---

[101] Impax Code of Conduct, *available at* http://s1.q4cdn.com/790711406/files/doc_downloads/Code-of-Conduct-2016.pdf

[102] Lannett Code of Business Conduct and Ethics, *available at* http://www.lannett.com/docs/2013_Code_of_Business_Conduct_and_Ethics.pdf

[103] Mylan Code of Business Conduct and Ethics, *available at* https://www.mylan.com/-/media/mylancom/files/code%20of%20business%20conduct%20and%20ethics.pdf

[104] Par Code of Ethics, *available at* http://corpdocs.msci.com/ethics/eth_19100.pdf.

[105] Hikma Code of Conduct, *available at* http://www.hikma.com/en/sustainability/Code-of-conduct.html

74

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**B.      Fraudulent Concealment Tolled the Statutes of Limitations**

176.    In the alternative, application of the doctrine of fraudulent concealment tolled the statutes of limitations on the claims asserted by Plaintiffs.  Plaintiffs had no knowledge of the combination or conspiracy alleged in this Complaint, or of facts sufficient to place them on inquiry notice of their claims, until Defendants disclosed the existence of government investigations and subpoenas. Prior to that time, no information in the public domain or available to Plaintiffs suggested that any Defendant was involved in a criminal conspiracy to fix prices for generic Digoxin.

177.    No information evidencing antitrust violations was available in the public domain prior to the public announcements of the government investigations that revealed sufficient information to suggest that any of the defendants was involved in a criminal conspiracy to fix prices for generic Digoxin.

178.    As described in more detail below, Defendants actively concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the Classes concerning Defendants' unlawful activities to artificially inflate prices for generic Digoxin. The concealed, suppressed, and omitted facts would have been important to Plaintiffs and members of the Classes as they related to the cost of generic Digoxin they purchased. Defendants misrepresented the real cause of price increases and/or the absence of price reductions in generic Digoxin. Defendants' false statements and conduct concerning the prices of generic Digoxin were deceptive as they had the tendency or capacity to mislead Plaintiffs and members of the Classes to believe that they were purchasing generic Digoxin at prices established by a free and fair market.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

### 1.   Active Concealment of the Conspiracy

179.   Defendants engaged in an illegal scheme to fix prices, allocate customers and rig bids. Criminal and civil penalties for engaging in such conduct are severe.  Not surprisingly, Defendants took affirmative measures to conceal their conspiratorial conduct.

180.   Through their misleading, deceptive, false and fraudulent statements, Defendants effectively concealed their conspiracy, thereby causing economic harm to Plaintiffs and the Classes. Defendants' misrepresentations regarding their price changes were intended to lull Plaintiffs and the Classes into accepting the price hikes as a normal result of competitive and economic market trends rather than as the consequence of Defendants' collusive acts. The public statements made by Defendants were designed to mislead Plaintiffs and the Classes into paying unjustifiably higher prices for generic Digoxin.

181.   As explained in the State AG complaint, the nature of the generic drug industry—which allows for frequent and repeated face-to-face meetings among competitors—means that "Most of the conspiratorial communications were intentionally done in person or by cell phone, in an attempt to avoid creating a record of their illegal conduct. The generic drug industry, through the aforementioned opportunities to collude at trade shows, customer events and smaller more intimate dinners and meetings, allowed these communications to perpetuate."[106]

182.   Defendants falsely denied that their price increases were caused by agreements with one another. For example, in earnings calls held in 2015 and 2016, Bedrosian of Lannett repeatedly denied that his company engaged in any wrongdoing. Moreover, Bedrosian defended

---

[106] State AG Complaint ¶ 13.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

his company's price hikes on generic drugs like Digoxin, calling them "[c]onsistent with industry norms."[107]

183.    In an August 2015 press release, Impax misleadingly characterized "significantly lower sales of generic Digoxin as a result of additional competition."[108] In fact, the conspiracy among Defendants reduced competition in the market for generic Digoxin, and prices remained at supracompetitive levels.

184.    These types of false statements and others made by Defendants helped conceal the illegal conspiracy entered into by Defendants to fix, stabilize, maintain and raise the price of generic Digoxin to inflated, supracompetitive levels.

## 2.    Plaintiffs Exercised Reasonable Diligence

185.    Defendants' anticompetitive conspiracy, by its very nature, was self-concealing. Generic drugs are not exempt from antitrust regulation, and thus, before the disclosure of the government investigations, Plaintiffs reasonably considered the markets to be competitive. Accordingly, a reasonable person under the circumstances would not have been alerted to investigate the legitimacy of Defendants' prices before these disclosures.

186.    Because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to conceal their illicit conduct, Plaintiffs and the Classes

---

[107] Nathan Vardi, *Another Company that Raises Prices Like Crazy*, Forbes (Oct. 6, 2016), *available at* http://www.forbes.com/sites/nathanvardi/2016/10/06/another-drug-company-that-raises-prices-like-crazy/2/#1c41cf0e77ef.

[108] Impax Press Release (Aug. 10, 2015), *available at* http://investors.impaxlabs.com/Media-Center/Press-Releases/Press-Release-Details/2015/Impax-Reports-Second-Quarter-2015-Financial-Results/default.aspx.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

could not have discovered the conspiracy at an earlier date by the exercise of reasonable diligence.

187.    Therefore, the running of any statutes of limitations has been tolled for all claims alleged by Plaintiffs and the Classes as a result of Defendants' anticompetitive and unlawful conduct.  Despite the exercise of reasonable diligence, Plaintiffs and Members of the Classes were unaware of Defendants' unlawful conduct, and did not know that they were paying supracompetitive prices throughout the United States during the Class Period.

188.    For these reasons, Plaintiffs' claims are timely under all of the federal, state and common laws identified herein.

## XI.    CONTINUING VIOLATIONS

189.    This Complaint alleges a continuing course of conduct (including conduct within the limitations periods), and defendants' unlawful conduct has inflicted continuing and accumulating harm within the applicable statutes of limitations. Thus, Plaintiffs and the members of the Damages Class can recover for damages that they suffered during any applicable limitations period.

## XII.    DEFENDANTS' ANTITRUST VIOLATIONS

190.    During the Class Period, set forth below, Defendants engaged in a continuing agreement, understanding, and conspiracy in restraint of trade to allocate customers, rig bids, and fix raise and/or stabilize prices for generic Digoxin sold in the United States.

191.    In formulating and effectuating the contract, combination or conspiracy, Defendants identified above and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to allocate customers, rig bids and artificially fix, raise,

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

maintain, and/or stabilize the price of generic Digoxin sold in the United States. These activities included the following:

(a)     Defendants participated in meetings and/or conversations regarding the price of generic Digoxin in the United States;

(b)     Defendants agreed during those meetings and conversations to charge prices at specified levels and otherwise to increase and/or maintain prices of generic Digoxin sold in the United States;

(c)     Defendants agreed during those meetings and conversations to allocate customers, rig bids, and fix the price of generic Digoxin; and

(d)     Defendants issued price announcements and price quotations in accordance with their agreements.

192.     Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating the unlawful agreements described in this Complaint.

193.     During and throughout the period of the conspiracy alleged in this Complaint, Plaintiffs and members of the Classes indirectly purchased generic Digoxin at inflated and supracompetitive prices.

194.     Defendants' contract, combination and conspiracy constitutes an unreasonable restraint of trade and commerce in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3) and the laws of various End-Payer Damages Jurisdictions enumerated below.

195.     As a result of Defendants' unlawful conduct, Plaintiffs and the other members of the Classes have been injured in their business and property in that they have paid more for generic Digoxin than they would have paid in a competitive market.

79

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

196.    General economic principles recognize that any overcharge at a higher level of distribution generally results in higher prices at every level below. Moreover, the institutional structure of pricing and regulation in the pharmaceutical drug industry assures that overcharges at the higher level of distribution are passed on to end-payers such as Plaintiffs. Wholesalers and retailers passed on the inflated prices to Plaintiffs and members of the Class. The impairment of generic competition at the direct purchaser level similarly injured Plaintiffs who were equally denied the opportunity to purchase less expensive generic versions of Digoxin.

197.    The unlawful contract, combination and conspiracy has had the following effects, among others:

(a)     price competition in the market for generic Digoxin has been artificially restrained;

(b)     prices for generic Digoxin sold by Defendants have been raised, fixed, maintained, or stabilized at artificially high and non-competitive levels; and

(c)     end-payer purchasers of generic Digoxin sold by Defendants have been deprived of the benefit of free and open competition in the market for generic Digoxin.

## XIII.    CLASS ACTION ALLEGATIONS

198.    Plaintiffs bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief on behalf of the following class (the "Nationwide Class"):

> All persons and entities in the United States and its territories who indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price for Defendants' generic Digoxin products, other than for resale, from October 1, 2013 through the present.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

This class excludes:  (a) Defendants, their officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal and state governmental entities except for cities, towns, municipalities, or counties with self-funded prescription drug plans; (c) all persons or entities who purchased Defendants' generic Digoxin products for purposes of resale or directly from Defendants; (d) fully insured health plans (*i.e.*, health plans that purchased insurance covering 100% of their reimbursement obligation to members); (e) any "flat co-pay" consumers whose purchases of Defendants' generic Digoxin products were paid in part by a third party payer and whose co-payment was the same regardless of the retail purchase price; (f) pharmacy benefit managers; and (g) any judges or justices involved in this action and any members of their immediate families.

199.    Plaintiffs also bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant to the common law of unjust enrichment and the state antitrust, unfair competition, and consumer protection laws of the states and territories listed below (the "End-Payer Damages Jurisdictions")[109] on behalf of the following class (the "Damages Class"):

All persons and entities in the End-Payer Damages Jurisdictions who indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price for Defendants' generic Digoxin products, other than for resale, from October 1, 2013 through the present.

This class excludes: (a) Defendants, their officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal and state governmental entities except for cities, towns, municipalities, or counties with self-funded prescription drug plans; (c) all persons or entities who purchased Defendants' generic Digoxin products for purposes of resale or directly from Defendants; (d) fully insured health plans (i.e., health plans that purchased insurance covering 100% of their reimbursement obligation to members); (e) any "flat co-pay" consumers whose

---

[109] The "End-Payer Damages Jurisdictions" include all States (except Indiana and Ohio), as well as the District of Columbia, Puerto Rico, and the U.S. Virgin Islands.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

purchases of Defendants' generic Digoxin products were paid in part by a third party payer and whose co-payment was the same regardless of the retail purchase price; (f) pharmacy benefit managers; and (g) any judges or justices involved in this action and any members of their immediate families.

200.    The Nationwide Class and the Damages Class are referred to herein as the "Classes."

201.    While Plaintiffs do not know the exact number of the members of the Classes, Plaintiffs believe there are thousands of members in each Class.

202.    Common questions of law and fact exist as to all members of the Classes. This is particularly true given the nature of Defendants' conspiracy, which was generally applicable to all the members of both Classes, thereby making appropriate relief with respect to the Classes as a whole. Such questions of law and fact common to the Classes include, but are not limited to:

(a)    Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain and/or stabilize prices of generic Digoxin and/or engaged in market allocation for generic Digoxin sold in the United States;

(b)    The identity of the participants of the alleged conspiracy;

(c)    The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

(d)    Whether the alleged conspiracy violated the Sherman Act, as alleged in the First Count;

(e)    Whether the alleged conspiracy violated state antitrust and unfair competition laws, and/or state consumer protection laws, as alleged in the Second and Third Counts;

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

(f)    Whether Defendants unjustly enriched themselves to the detriment of the Plaintiffs and the members of the Classes, thereby entitling Plaintiffs and the members of the Classes to disgorgement of all benefits derived by Defendants, as alleged in the Fourth Count;

(g)    Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and the members of the Classes;

(h)    The effect of the alleged conspiracy on the prices of generic Digoxin sold in the United States during the Class Period;

(i)    Whether the Defendants and their co-conspirators actively concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the Classes concerning Defendants' unlawful activities to artificially inflate prices for generic Digoxin, and/or fraudulently concealed the unlawful conspiracy's existence from Plaintiffs and the other members of the Classes;

(j)    The appropriate injunctive and related equitable relief for the Nationwide Class; and

(k)    The appropriate class-wide measure of damages for the Damages Class.

203.    Plaintiffs' claims are typical of the claims of the members of the Classes. Plaintiffs and all members of the Classes are similarly affected by Defendants' wrongful conduct in that they paid artificially inflated prices for generic Digoxin purchased indirectly from Defendants and/or their co-conspirators. Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

204.    Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Classes. Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

205.    The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

206.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

207.    The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

84

## XIV.   CAUSES OF ACTION

### FIRST COUNT

### Violation of Sections 1 and 3 of the Sherman Act
### (on behalf of Plaintiffs and the Nationwide Class)

208.   Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

209.   Defendants and their unnamed co-conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. § 1, 3).

210.   During the Class Period, Defendants and their co-conspirators entered into a continuing agreement, understanding and conspiracy in restraint of trade to artificially allocate customers, rig bids and raise, maintain and fix prices for generic Digoxin, thereby creating anticompetitive effects.

211.   The conspiratorial acts and combinations have caused unreasonable restraints in the market for generic Digoxin.

212.   As a result of Defendants' unlawful conduct, Plaintiffs and other similarly situated End-Payers in the Nationwide Class who purchased generic Digoxin have been harmed by being forced to pay inflated, supracompetitive prices for generic Digoxin.

213.   In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including, but not limited to, the acts, practices and course of conduct set forth herein.

214.   Defendants' conspiracy had the following effects, among others:

85

(a)     Price competition in the market for generic Digoxin has been restrained, suppressed, and/or eliminated in the United States;

(b)     Prices for generic Digoxin provided by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States; and

(c)     Plaintiffs and members of the Nationwide Class who purchased generic Digoxin indirectly from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

215.    Plaintiffs and members of the Nationwide Class have been injured and will continue to be injured in their business and property by paying more for generic Digoxin purchased indirectly from Defendants and the co-conspirators than they would have paid and will pay in the absence of the conspiracy.

216.    Defendants' contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

217.    Plaintiffs and members of the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the continuing violations alleged herein.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

## SECOND COUNT

### Violation of State Antitrust Statutes[110]
### (on behalf of Plaintiffs and the Damages Class)

218.    Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

219.    During the Class Period, Defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy with respect to the sale of generic Digoxin in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

220.    The contract, combination, or conspiracy consisted of an agreement among Defendants and their co-conspirators to fix, raise, inflate, stabilize, and/or maintain the prices of generic Digoxin and to allocate customers for generic Digoxin in the United States.

221.    In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including: (a) participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to price generic Digoxin at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiffs and members of the Damages Class with respect to generic Digoxin provided in the United States; and (b)

---

[110] Statutory antitrust violations are alleged herein for the following jurisdictions: Arizona, California, Connecticut, District of Columbia, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia and Wisconsin.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

participating in meetings and trade association conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

222.   Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreement to allocate customers, rig bids, and fix prices for generic Digoxin.

223.   Defendants' anticompetitive acts described above were knowing, willful and constitute violations or flagrant violations of the following state antitrust statutes.

224.   [INTENTIONALLY LEFT BLANK]

**Arizona**

225.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Arizona Revised Statutes, § 44-1401, *et seq*. Defendants' combination and conspiracy had the following effects: (1) price competition for generic Digoxin was restrained, suppressed, and eliminated throughout Arizona; (2) generic Digoxin prices were raised, fixed, maintained and stabilized at artificially high levels throughout Arizona; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Digoxin. During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce. Defendants' violations of Arizona law were flagrant.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants entered into an agreement in restraint of trade in violation of Ariz. Rev.

88

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Stat. § 44-1401, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Ariz. Rev. Stat. § 44-1401, *et seq*.

**California**

226.    Defendants have entered into an unlawful agreement in restraint of trade in violation of California Business and Professions Code § 16700 *et seq*. During the Class Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of California Business and Professions Code §16720. Defendants, and each of them, have acted in violation of § 16720 to fix, raise, stabilize, and maintain prices of generic Digoxin at supracompetitive levels. The aforesaid violations of § 16720 consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of generic Digoxin. For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including, but not limited to, the acts, practices and course of conduct set forth above and creating a price floor, fixing, raising, and stabilizing the price of generic Digoxin. The combination and conspiracy alleged herein has had, *inter alia*, the following effects: (1) price competition for generic Digoxin has been restrained, suppressed, and/or eliminated in the State of California; (2) prices for generic Digoxin provided by Defendants and their co-conspirators have been fixed, raised, stabilized, and pegged at artificially high, non-competitive levels in the State of California; and (3) those who purchased generic Digoxin indirectly from Defendants and their co-conspirators have been deprived of the benefit of free and open competition. As a direct and proximate result of Defendants' unlawful

89

conduct, Plaintiffs and members of the Damages Class have been injured in their business and property in that they paid more for generic Digoxin than they otherwise would have paid in the absence of Defendants' unlawful conduct. During the Class Period, Defendants' illegal conduct substantially affected California commerce. As a result of Defendants' violation of § 16720, Plaintiffs and members of the Damages Class seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to California Business and Professions Code § 16750(a).

**Connecticut**

226(a). Defendants have entered into an unlawful agreement in restraint of trade in violation of the Connecticut Antitrust Act, Conn. Gen. Stat. § 35-35, *et seq*. Defendants' combinations and conspiracy had the following effects: (1) price competition for generic Digoxin was restrained, suppressed, and eliminated throughout Connecticut; (2) generic Digoxin prices were raised, fixed, maintained and stabilized at artificially high levels throughout Connecticut; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Digoxin. During the Class Period, Defendants' illegal conduct substantially affected Connecticut commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants entered into an agreement in restraint of trade in violation of Conn. Gen. Stat. § 35-35, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Connecticut law.

90

**District of Columbia**

227.   Defendants have entered into an unlawful agreement in restraint of trade in violation of District of Columbia Code Annotated § 28-4501, *et seq*. Defendants' combination and conspiracy had the following effects: (1) generic Digoxin price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) generic Digoxin prices were raised, fixed, maintained and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and members of the Damages Class, including those who resided in the District of Columbia and/or purchased generic Digoxin in the District of Columbia that were shipped by Defendants or their co-conspirators into the District of Columbia, were deprived of free and open competition, including in the District of Columbia; and (4) Plaintiffs and members of the Damages Class, including those who resided in the District of Columbia and/or purchased generic Digoxin in the District of Columbia that were shipped by Defendants or their co-conspirators, paid supracompetitive, artificially inflated prices for generic Digoxin, including in the District of Columbia. During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of District of Columbia Code Ann. § 28-4501, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under District of Columbia Code Ann. § 28-4501, *et seq*.

91

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Hawaii**

228.     Defendants have entered into an unlawful agreement in restraint of trade in violation of Hawaii Revised Statutes Annotated § 480-1, *et seq*. Defendants' unlawful conduct had the following effects: (1) generic Digoxin price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) generic Digoxin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Digoxin. During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Hawaii Revised Statutes Annotated § 480-4, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Hawaii Revised Statutes Annotated § 480-4, *et seq*.

**Illinois**

229.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Illinois Antitrust Act (740 Illinois Compiled Statutes 10/1, *et seq*.) Defendants' combination or conspiracy had the following effects: (1) generic Digoxin price competition was restrained, suppressed, and eliminated throughout Illinois; (2) generic Digoxin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Illinois; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and

92

(4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Digoxin. During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under the Illinois Antitrust Act.

**Iowa**

230.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Iowa Code § 553.1, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Digoxin price competition was restrained, suppressed, and eliminated throughout Iowa; (2) generic Digoxin prices were raised, fixed, maintained and stabilized at artificially high levels throughout Iowa; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Digoxin. During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Iowa Code § 553.1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Iowa Code § 553, *et seq*.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Kansas**

231.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Kansas Statutes Annotated, § 50-101, *et seq*. Defendants' combined capital, skills or acts for the purposes of creating restrictions in trade or commerce of generic Digoxin, increasing the prices of generic Digoxin, preventing competition in the sale of generic Digoxin, or binding themselves not to sell generic Digoxin, in a manner that established the price of generic Digoxin and precluded free and unrestricted competition among themselves in the sale of generic Digoxin, in violation of Kan. Stat. Ann. § 50-101, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Digoxin price competition was restrained, suppressed, and eliminated throughout Kansas; (2) generic Digoxin prices were raised, fixed, maintained and stabilized at artificially high levels throughout Kansas; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Digoxin. During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Kansas Stat. Ann. § 50-101, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Kansas Stat. Ann. § 50-101, *et seq*.

**Maine**

232.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Maine Revised Statutes (Maine Rev. Stat. Ann. 10, § 1101, *et seq*.) Defendants'

94

combination or conspiracy had the following effects: (1) generic Digoxin price competition was restrained, suppressed, and eliminated throughout Maine; (2) generic Digoxin prices were raised, fixed, maintained and stabilized at artificially high levels throughout Maine; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Digoxin. During the Class Period, Defendants' illegal conduct substantially affected Maine commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Maine Rev. Stat. Ann. 10, § 1101, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Maine Rev. Stat. Ann. 10, § 1101, *et seq.*

**Maryland**

232(a). Defendants have entered into an unlawful agreement in restraint of trade in violation of the Maryland Antitrust Act, Maryland Code, Com. Law § 11-204, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Digoxin price competition was restrained, suppressed, and eliminated throughout Maryland; (2) generic Digoxin prices were raised, fixed, maintained and stabilized at artificially high levels throughout Maryland; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Digoxin. During the Class Period, Defendants' illegal conduct substantially affected Maryland commerce. As a direct and proximate result of

95

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.  By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of the Maryland Antitrust Act. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Maryland law.

**Michigan**

233.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Michigan Compiled Laws Annotated § 445.771, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Digoxin price competition was restrained, suppressed, and eliminated throughout Michigan; (2) generic Digoxin prices were raised, fixed, maintained and stabilized at artificially high levels throughout Michigan; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Digoxin. During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Michigan Comp. Laws Ann. § 445.771, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Michigan Comp. Laws Ann. § 445.771, *et seq*.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Minnesota**

234.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Minnesota Annotated Statutes § 325D.49, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Digoxin price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) generic Digoxin prices were raised, fixed, maintained and stabilized at artificially high levels throughout Minnesota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Digoxin. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Minnesota Stat. § 325D.49, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Minnesota Stat. § 325D.49, *et seq*.

**Mississippi**

235.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Mississippi Code Annotated § 75-21-1, *et seq*. Trusts are combinations, contracts, understandings or agreements, express or implied when inimical to the public welfare and with the effect of, *inter alia*, restraining trade, increasing the price or output of a commodity, or hindering competition in the production and sale of a commodity. Miss. Code Ann. § 75-21-1. Defendants' combination or conspiracy was in a manner inimical to public welfare and had the

97

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

following effects: (1) generic Digoxin price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) generic Digoxin prices were raised, fixed, maintained and stabilized at artificially high levels throughout Mississippi; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Digoxin. During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Mississippi Code Ann. § 75-21-1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Mississippi Code Ann. § 75-21-1, *et seq*.

**Nebraska**

236.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Nebraska Revised Statutes § 59-801, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Digoxin price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) generic Digoxin prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nebraska; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Digoxin. During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Nebraska Revised Statutes § 59-801, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nebraska Revised Statutes § 59-801, *et seq*.

**Nevada**

237.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Nevada Revised Statutes Annotated § 598A.010, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Digoxin price competition was restrained, suppressed, and eliminated throughout Nevada; (2) generic Digoxin prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nevada; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Digoxin. During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Nevada Rev. Stat. Ann. § 598A.010, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nevada Rev. Stat. Ann. § 598A.010, *et seq*.

**New Hampshire**

238.    Defendants have entered into an unlawful agreement in restraint of trade in

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

violation of New Hampshire Revised Statutes § 356:1, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Digoxin price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) generic Digoxin prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Hampshire; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Digoxin. During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of New Hampshire Revised Statutes § 356:1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Hampshire Revised Statutes § 356:1, *et seq*.

**New Mexico**

239.    Defendants have entered into an unlawful agreement in restraint of trade in violation of New Mexico Statutes Annotated § 57-1-1, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Digoxin price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) generic Digoxin prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Digoxin. During the Class Period, Defendants' illegal conduct substantially affected

100

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

New Mexico commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of New Mexico Stat. Ann. § 57-1-1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Mexico Stat. Ann. § 57-1-1, *et seq*.

**New York**

240.    Defendants have entered into an unlawful agreement in restraint of trade in violation of New York's Donnelly Act, New York General Business Law § 340, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Digoxin price competition was restrained, suppressed, and eliminated throughout New York; (2) generic Digoxin prices were raised, fixed, maintained and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Digoxin that were higher than they would have been absent Defendants' illegal acts. During the Class Period, Defendants' illegal conduct substantially affected New York commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of the New York's Donnelly Act, New York General Business Law § 340, *et seq*. The conduct set forth above is a *per se* violation of the

101

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Act. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New York Gen. Bus. Law § 340, *et seq*.

**North Carolina**

241.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Carolina General Statutes § 75-1, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Digoxin price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) generic Digoxin prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Digoxin. During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of North Carolina Gen. Stat. § 75-1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Carolina Gen. Stat. § 75-1, *et. seq*.

**North Dakota**

242.    Defendants have entered into an unlawful agreement in restraint of trade in violation of North Dakota Century Code § 51-08.1-01, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Digoxin price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) generic Digoxin prices were raised,

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

fixed, maintained and stabilized at artificially high levels throughout North Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Digoxin. During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of North Dakota Cent. Code § 51-08.1-01, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Dakota Cent. Code § 51-08.1-01, *et seq.*

### Oregon

243.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Oregon Revised Statutes § 646.705, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Digoxin price competition was restrained, suppressed, and eliminated throughout Oregon; (2) generic Digoxin prices were raised, fixed, maintained and stabilized at artificially high levels throughout Oregon; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Digoxin. During the Class Period, Defendants' illegal conduct had a substantial effect on Oregon commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of

103

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

trade in violation of Oregon Revised Statutes § 646.705, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Oregon Revised Statutes § 646.705, *et seq*.

**Rhode Island**

244.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the Rhode Island Antitrust Act, Rhode Island General Laws § 6-36-1, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Digoxin price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) generic Digoxin prices were raised, fixed, maintained and stabilized at artificially high levels throughout Rhode Island; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Digoxin. During the Class Period, Defendants' illegal conduct had a substantial effect on Rhode Island commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property on or after July 15, 2013, and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Rhode Island General Laws § 6-36-1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Rhode Island General Laws § 6-36-1, *et seq*.

**South Dakota**

245.   Defendants have entered into an unlawful agreement in restraint of trade in violation of South Dakota Codified Laws § 37-1-3.1, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Digoxin price competition was restrained,

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

suppressed, and eliminated throughout South Dakota; (2) generic Digoxin prices were raised, fixed, maintained and stabilized at artificially high levels throughout South Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Digoxin. During the Class Period, Defendants' illegal conduct had a substantial effect on South Dakota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of South Dakota Codified Laws Ann. § 37-1-3.1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under South Dakota Codified Laws Ann. § 37-1-3.1, *et seq*.

**Tennessee**

246.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Tennessee Code Annotated § 47-25-101, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Digoxin price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) generic Digoxin prices were raised, fixed, maintained and stabilized at artificially high levels throughout Tennessee; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Digoxin. During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Tennessee Code Ann. § 47-25-101, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Tennessee Code Ann. § 47-25-101, *et seq*.

**Utah**

247.     Defendants have entered into an unlawful agreement in restraint of trade in violation of Utah Code Annotated § 76-10-3101, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Digoxin price competition was restrained, suppressed, and eliminated throughout Utah; (2) generic Digoxin prices were raised, fixed, maintained and stabilized at artificially high levels throughout Utah; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Digoxin. During the Class Period, Defendants' illegal conduct had a substantial effect on Utah commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Utah Code Annotated § 76-10-3101, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Utah Code Annotated § 76-10-3101, *et seq*.

**Vermont**

248.     Defendants have entered into an unlawful agreement in restraint of trade in violation of Vermont Stat. Ann. 9 § 2453, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Digoxin price competition was restrained, suppressed, and

106

eliminated throughout Vermont; (2) generic Digoxin prices were raised, fixed, maintained and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Digoxin. During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Vermont Stat. Ann. 9 § 2453, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Vermont Stat. Ann. 9 § 2453, *et seq*.

**West Virginia**

249.    Defendants have entered into an unlawful agreement in restraint of trade in violation of West Virginia Code § 47-18-1, *et seq*. Defendants' anticompetitive acts described above were knowing, willful, and constitute violations or flagrant violations of West Virginia Antitrust Act. Defendants' combination or conspiracy had the following effects: (1) generic Digoxin price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) generic Digoxin prices were raised, fixed, maintained and stabilized at artificially high levels throughout West Virginia; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Digoxin. During the Class Period, Defendants' illegal conduct had a substantial effect on West Virginia commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class

107

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of West Virginia Code § 47-18-1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under West Virginia Code § 47-18-1, *et seq*.

**Wisconsin**

250.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Wisconsin Statutes § 133.01, *et seq*. Defendants' and their co-conspirators' anticompetitive activities have directly, foreseeably and proximately caused injury to Plaintiffs and members of the Classes in the United States. Specifically, Defendants' combination or conspiracy had the following effects: (1) generic Digoxin price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) generic Digoxin prices were raised, fixed, maintained and stabilized at artificially high levels throughout Wisconsin; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Digoxin.  During the Class Period, Defendants' illegal conduct had a substantial effect on the people of Wisconsin and Wisconsin commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Wisconsin Stat. § 133.01, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Wisconsin Stat. § 133.01, *et seq*.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**As to All Jurisdictions Above**

251.    Plaintiffs and members of the Damages Class in each of the above jurisdictions have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy and agreement. Plaintiffs and members of the Damages Class have paid more for generic Digoxin than they otherwise would have paid in the absence of Defendants' unlawful conduct. This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

252.    In addition, Defendants have profited significantly from the aforesaid conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of Plaintiffs and members of the Damages Class.

253.    Accordingly, Plaintiffs and members of the Damages Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

## <u>THIRD COUNT</u>

### Violation of State Consumer Protection Statutes[111]
### <u>(on behalf of Plaintiffs and the Damages Class)</u>

254.    Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

---

[111] Statutory consumer protection violations are alleged herein for the following jurisdictions: Alaska, Arkansas, California, Colorado, Delaware, District of Columbia, Florida, Georgia, Hawaii, Massachusetts, Michigan, Minnesota, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Rhode Island, South Carolina, South Dakota, Utah, Vermont, Virginia, West Virginia, Wisconsin and the U.S. Virgin Islands.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

255.    Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

**Alaska**

256.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Alaska Statute § 45.50.471, *et seq*.   Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic Digoxin were sold, distributed, or obtained in Alaska and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. The aforementioned conduct on the part of Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Alaska law.  Defendants' unlawful conduct had the following effects: (1) generic Digoxin price competition was restrained, suppressed, and eliminated throughout Alaska; (2) generic Digoxin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Alaska; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Digoxin. During the Class Period, Defendants' illegal conduct substantially affected Alaska commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Alaska Stat. § 45.50.471, *et seq*., and,

110

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Arkansas**

257.    Defendants have knowingly entered into an unlawful agreement in restraint of trade in violation of the Arkansas Code Annotated, § 4-88-101, *et seq*. Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic Digoxin were sold, distributed, or obtained in Arkansas and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. The aforementioned conduct on the part of Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10). Defendants' unlawful conduct had the following effects: (1) generic Digoxin price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) generic Digoxin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Digoxin. During the Class Period, Defendants' illegal conduct substantially affected Arkansas commerce and consumers. As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10) and,

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**California**

258.    Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of California Business and Professions Code § 17200, *et seq*. During the Class Period, Defendants manufactured, marketed, sold, or distributed generic Digoxin in California, and committed and continue to commit acts of unfair competition, as defined by § 17200, *et seq*. of the California Business and Professions Code, by engaging in the acts and practices specified above. This claim is instituted pursuant to §§ 17203 and 17204 of the California Business and Professions Code, to obtain restitution from these Defendants for acts, as alleged herein, that violated § 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law. Defendants' conduct as alleged herein violated § 17200. The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business and Professions Code §17200, *et seq*., including, but not limited to, the following: (1) the violations of Section 1 of the Sherman Act, as set forth above; (2) the violations of § 16720, *et seq*. of the California Business and Professions Code, set forth above. Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of § 16720, *et seq*. of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent; (3) Defendants' acts or practices are

112

unfair to purchasers of generic Digoxin in the State of California within the meaning of § 17200, California Business and Professions Code; and (4) Defendants' acts and practices are fraudulent or deceptive within the meaning of Section 17200 of the California Business and Professions Code. Plaintiffs and members of the Damages Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that have been obtained by Defendants as a result of such business acts or practices. During the Class Period, Defendants' illegal conduct substantially affected California commerce and consumers. The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future. The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Plaintiffs and members of the Damages Class to pay supracompetitive and artificially-inflated prices for generic Digoxin. Plaintiffs and members of the Damages Class suffered injury in fact and lost money or property as a result of such unfair competition. The conduct of Defendants as alleged in this Complaint violates § 17200 of the California Business and Professions Code. As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiffs and members of the Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to the California Business and Professions Code, §§17203 and 17204.

113

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Colorado**

259.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Colorado Consumer Protection Act, Colorado Rev. Stat. § 6-1-101, *et seq*.  Defendants engaged in an unfair and deceptive trade practices during the course of their business dealings, which significantly impacted Plaintiffs as actual or potential consumers of the Defendants' goods and which caused Plaintiffs to suffer injury. Defendants took efforts to conceal their agreements from Plaintiffs. Defendants' unlawful conduct had the following effects: (1) generic Digoxin price competition was restrained, suppressed, and eliminated throughout Colorado; (2) generic Digoxin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Colorado; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Digoxin. During the Class Period, Defendants' illegal conduct substantially affected Colorado commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Colorado Rev. Stat. § 6-1-101, *et seq*., and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute and as equity demands.

**Delaware**

260.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Delaware Consumer Fraud Act, 6 Del. Code § 2511, *et seq*.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in

114

Delaware, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Digoxin were sold, distributed, or obtained in Delaware. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Digoxin. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Digoxin prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Digoxin price competition was restrained, suppressed, and eliminated throughout Delaware; (2) generic Digoxin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Delaware; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Digoxin. During the Class Period, Defendants' illegal conduct had a substantial effect on Delaware commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Digoxin, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Digoxin at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of 6 Del. Code § 2511, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**District of Columbia**

261.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which generic Digoxin were sold, distributed or obtained in the District of Columbia. During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce and consumers. The foregoing conduct constitutes "unlawful trade practices," within the meaning of D.C. Code § 28-3904. Plaintiffs and members of the Damages Class were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. Defendants had the sole power to set that price and Plaintiffs and members of the Damages Class had no power to negotiate a lower price. Moreover, Plaintiffs and members of the Damages Class lacked any meaningful choice in purchasing generic Digoxin because they were unaware of the unlawful overcharge, and there was no alternative source of supply through which Plaintiffs and members of the Damages Class could avoid the overcharges. Defendants' conduct with regard to sales of generic Digoxin, including their illegal conspiracy to secretly fix the price of generic Digoxin at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public. Defendants took grossly unfair advantage of Plaintiffs and members of the Damages Class. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for purchasers so that there was a gross disparity between the price paid and the value received for generic

116

Digoxin. Defendants' unlawful conduct had the following effects: (1) generic Digoxin price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) generic Digoxin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Digoxin. As a direct and proximate result of Defendants' conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Florida**

262.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq.* Defendants' unlawful conduct had the following effects: (1) generic Digoxin price competition was restrained, suppressed, and eliminated throughout Florida; (2) generic Digoxin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Digoxin. During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Florida Stat. § 501.201, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

### Georgia

263.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Georgia Uniform Deceptive Trade Practices Act, Georgia Code § 10-1-370, *et seq*. and the Georgia Fair Businesses Practices Act, Georgia Code Ann. § 10-1-390, *et seq*.   Defendants agreed to, and did in fact, act in restraint of trade or commerce in Georgia, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Digoxin were sold, distributed, or obtained in Georgia. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Digoxin. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Digoxin prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Digoxin price competition was restrained, suppressed, and eliminated throughout Georgia; (2) generic Digoxin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Georgia; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Digoxin. During the Class Period, Defendants' illegal conduct had a substantial effect on Georgia commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above and are threatened with further injury. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Digoxin, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Digoxin at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of Georgia law, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute and as equity demands.

**Hawaii**

264.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Hawaii Revised Statutes Annotated § 480-1, *et seq*. Defendants' unlawful conduct had the following effects: (1) generic Digoxin price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) generic Digoxin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Digoxin. During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or

119

deceptive acts or practices in violation of Hawaii Rev. Stat. § 480-1 *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Massachusetts**

265.   Defendants have engaged in unfair competition or unlawful, unfair, unconscionable, or deceptive acts or practices in violation of the Massachusetts Gen. Laws, Ch 93A, § 1, *et seq*. Defendants were engaged in trade or commerce as defined by G.L. 93A. Defendants, in a market that includes Massachusetts, agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic Digoxin were sold, distributed, or obtained in Massachusetts and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. The aforementioned conduct on the part of Defendants constituted "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce," in violation of Massachusetts Gen. Laws, Ch 93A, § 2, 11. Defendants' unlawful conduct had the following effects: (1) generic Digoxin price competition was restrained, suppressed, and eliminated throughout Massachusetts; (2) generic Digoxin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Massachusetts; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Damages Class paid supracompetitive, artificially inflated prices for generic Digoxin. During the Class Period, Defendants' illegal conduct substantially affected Massachusetts commerce and consumers. As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in

120

unfair competition or unfair or deceptive acts or practices in violation of Massachusetts Gen. Laws, Ch 93A, § 2, 11, that were knowing or willful, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute, including multiple damages.

**Michigan**

266.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Michigan Consumer Protection Statute, Mich. Compiled Laws § 445.903, *et seq*.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in Michigan, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Digoxin were sold, distributed, or obtained in Michigan. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Digoxin. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Digoxin prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Digoxin price competition was restrained, suppressed, and eliminated throughout Michigan; (2) generic Digoxin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Michigan; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Digoxin. During the Class Period, Defendants' illegal conduct had a substantial effect on Michigan commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Digoxin, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Digoxin at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of Mich. Compiled Laws § 445.903, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Minnesota**

267.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43, *et seq.*  Defendants engaged in an unfair and deceptive trade practices during the course of their business dealings, which significantly impacted Plaintiffs as actual or potential consumers of the Defendants' goods and which caused Plaintiffs to suffer injury. Defendants took efforts to conceal their agreements from Plaintiffs. Defendants' unlawful conduct had the following effects: (1) generic Digoxin price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) generic Digoxin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Digoxin. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. § 325D.43, *et seq*., and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute and as equity demands.

**Missouri**

268.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et seq*. Plaintiffs and members of the Damages Class purchased generic Digoxin for personal or family purposes. Defendants engaged in the conduct described herein in connection with the sale of generic Digoxin in trade or commerce in a market that includes Missouri. Defendants agreed to, and did in fact affect, fix, control, and/or maintain, at artificial and non-competitive levels, the prices at which generic Digoxin were sold, distributed, or obtained in Missouri, which conduct constituted unfair practices in that it was unlawful under federal and state law, violated public policy, was unethical, oppressive and unscrupulous, and caused substantial injury to Plaintiffs and members of the Damages Class. Defendants concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Digoxin. The concealed, suppressed, and omitted facts would have been important to Plaintiffs and members of the Damages Class as they related to the cost of generic Digoxin they purchased. Defendants misrepresented the real cause of price increases and/or the absence of price reductions in generic Digoxin by making public statements that were not in accord with the facts. Defendants' statements and conduct concerning the price of generic Digoxin were deceptive as they had the tendency or capacity to mislead Plaintiffs and members of the

123

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Damages Class to believe that they were purchasing generic Digoxin at prices established by a free and fair market. Defendants' unlawful conduct had the following effects: (1) generic Digoxin price competition was restrained, suppressed, and eliminated throughout Missouri; (2) generic Digoxin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Missouri; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Digoxin. The foregoing acts and practices substantially affected Missouri commerce and consumers and constituted unlawful practices in violation of the Missouri Merchandising Practices Act. As a direct and proximate result of the above-described unlawful practices, Plaintiffs and members of the Damages Class suffered ascertainable loss of money or property. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Missouri's Merchandising Practices Act, specifically Mo. Rev. Stat. § 407.020, which prohibits "[t]he act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce…", as further interpreted by the Missouri Code of State Regulations, 15 CSR 60-7.010, *et seq.*, 15 CSR 60-8.010, *et seq.*, and 15 CSR 60-9.010, *et seq.*, and Mo. Rev. Stat. § 407.025.

**Montana**

269.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Montana Unfair Trade Practices and Consumer Protection Act of 1970, Mont. Code, § 30-14-103, *et seq.*, and § 30-14-201, *et seq.* Defendants'

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

unlawful conduct had the following effects: (1) generic Digoxin price competition was restrained, suppressed, and eliminated throughout Montana; (2) generic Digoxin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Montana; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Digoxin. During the Class Period, Defendants marketed, sold, or distributed generic Digoxin in Montana, and Defendants' illegal conduct substantially affected Montana commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mont. Code, § 30-14-103, *et seq*., and § 30-14-201, *et. seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Nebraska**

270.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59-1601, *et seq*.  Defendants' unlawful conduct had the following effects: (1) generic Digoxin price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) generic Digoxin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nebraska; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Digoxin. During the Class Period, Defendants marketed, sold, or distributed generic Digoxin in Nebraska, and Defendants' illegal conduct substantially

125

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

affected Nebraska commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. § 59-1601, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Nevada**

271.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. § 598.0903, *et seq*.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in Nevada, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Digoxin were sold, distributed, or obtained in Nevada. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Digoxin. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Digoxin prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Digoxin price competition was restrained, suppressed, and eliminated throughout Nevada; (2) generic Digoxin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nevada; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Digoxin. During the Class Period, Defendants' illegal conduct had a substantial effect on Nevada commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and

126

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Digoxin, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Digoxin at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of Nev. Rev. Stat. § 598.0903, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**New Hampshire**

272.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Hampshire Consumer Protection Act, N.H. Rev. Stat. § 358-A:1, *et seq*.  Defendants' unlawful conduct had the following effects: (1) generic Digoxin price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) generic Digoxin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Hampshire; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Digoxin. During the Class Period, Defendants marketed, sold, or distributed generic Digoxin in New Hampshire, and Defendants' illegal conduct substantially affected New Hampshire commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured. Defendants have engaged in unfair competition or unfair or

127

deceptive acts or practices in violation of N.H. Rev. Stat. § 358-A:1, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**New Jersey**

273.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Jersey Consumer Fraud Act, N.J. Statutes § 56:8-1, *et seq.*  Defendants agreed to, and did in fact, act in restraint of trade or commerce in New Jersey, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Digoxin were sold, distributed, or obtained in New Jersey. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Digoxin. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Digoxin prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Digoxin price competition was restrained, suppressed, and eliminated throughout New Jersey; (2) generic Digoxin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Jersey; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Digoxin. During the Class Period, Defendants' illegal conduct had a substantial effect on New Jersey commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Digoxin, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Digoxin at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of N.J. Statutes § 56:8-1, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**New Mexico**

274.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Mexico Stat. § 57-12-1, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic Digoxin were sold, distributed or obtained in New Mexico and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. The aforementioned conduct on the part of Defendants constituted "unconscionable trade practices," in violation of New Mexico Stat. § 57-12-3, in that such conduct, *inter alia*, resulted in a gross disparity between the value received by Plaintiffs and members of the Damages Class and the prices paid by them for generic Digoxin as set forth in New Mexico Stat. § 57-12-2E. Plaintiffs and members of the Damages Class were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. Defendants had the sole power to set that price, and Plaintiffs and members of the Damages Class had no power to negotiate a lower price. Moreover, Plaintiffs and members of the Damages Class lacked any meaningful choice in purchasing generic Digoxin because they were unaware of the unlawful overcharge, and there

129

was no alternative source of supply through which Plaintiffs and members of the Damages Class could avoid the overcharges. Defendants' conduct with regard to sales of generic Digoxin, including their illegal conspiracy to secretly fix the price of generic Digoxin at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public. Defendants took grossly unfair advantage of Plaintiffs and members of the Damages Class. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for generic Digoxin. Defendants' unlawful conduct had the following effects: (1) generic Digoxin price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) generic Digoxin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Digoxin. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce and consumers. As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

130

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**New York**

275.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which generic Digoxin were sold, distributed or obtained in New York and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. Defendants and their co-conspirators made public statements about the prices of generic Digoxin that either omitted material information that rendered the statements that they made materially misleading or affirmatively misrepresented the real cause of price increases for generic Digoxin; and Defendants alone possessed material information that was relevant to consumers, but failed to provide the information. Because of Defendants' unlawful trade practices in the State of New York, New York class members who indirectly purchased generic Digoxin were misled to believe that they were paying a fair price for generic Digoxin or the price increases for generic Digoxin were for valid business reasons; and similarly situated consumers were affected by Defendants' conspiracy. Defendants knew that their unlawful trade practices with respect to pricing generic Digoxin would have an impact on New York consumers and not just Defendants' direct customers. Defendants knew that their unlawful trade practices with respect to pricing generic Digoxin would have a broad impact, causing consumer class members who indirectly purchased generic Digoxin to be injured by paying more for generic Digoxin than they would have paid in the absence of Defendants' unlawful trade acts and practices. The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349,

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

which resulted in consumer injury and broad adverse impact on the public at large, and harmed

the public interest of consumers in New York State in an honest marketplace in which economic

activity is conducted in a competitive manner. Defendants' unlawful conduct had the following

effects: (1) generic Digoxin price competition was restrained, suppressed, and eliminated

throughout New York; (2) generic Digoxin prices were raised, fixed, maintained, and stabilized

at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class

were deprived of free and open competition; and (4) Plaintiffs and members of the Damages

Class paid supracompetitive, artificially inflated prices for generic Digoxin. During the Class

Period, Defendants marketed, sold, or distributed generic Digoxin in New York, and Defendants'

illegal conduct substantially affected New York commerce and consumers. During the Class

Period, each of Defendants named herein, directly, or indirectly and through affiliates they

dominated and controlled, manufactured, sold and/or distributed generic Digoxin in New York.

Plaintiffs and members of the Damages Class seek all relief available pursuant to N.Y. Gen. Bus.

Law § 349(h).

**North Carolina**

276.   Defendants have engaged in unfair competition or unfair, unconscionable, or

deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq*. Defendants

agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling

and/or maintaining, at artificial and non-competitive levels, the prices at which generic Digoxin

were sold, distributed or obtained in North Carolina and took efforts to conceal their agreements

from Plaintiffs and members of the Damages Class. Defendants' price-fixing conspiracy could

not have succeeded absent deceptive conduct by Defendants to cover up their illegal acts.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Secrecy was integral to the formation, implementation and maintenance of Defendants' price-fixing conspiracy. Defendants committed inherently deceptive and self-concealing actions, of which Plaintiffs and members of the Damages Class could not possibly have been aware. Defendants and their co-conspirators publicly provided pretextual and false justifications regarding their price increases. Defendants' public statements concerning the price of generic Digoxin created the illusion of competitive pricing controlled by market forces rather than supracompetitive pricing driven by Defendants' illegal conspiracy. Moreover, Defendants deceptively concealed their unlawful activities by mutually agreeing not to divulge the existence of the conspiracy to outsiders. The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects: (1) generic Digoxin price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) generic Digoxin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Digoxin. During the Class Period, Defendants marketed, sold, or distributed generic Digoxin in North Carolina, and Defendants' illegal conduct substantially affected North Carolina commerce and consumers. During the Class Period, each of Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed generic Digoxin in North

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Carolina. Plaintiffs and members of the Damages Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**North Dakota**

277.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the North Dakota Unlawful Sales or Advertising Practices Statute, N.D. Century Code § 51-15-01, *et seq*.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in North Dakota, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Digoxin were sold, distributed, or obtained in North Dakota. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Digoxin. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Digoxin prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Digoxin price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) generic Digoxin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Digoxin. During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce and consumers. As a direct and proximate result of

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Digoxin, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Digoxin at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of N.D. Century Code § 51-15-01, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Rhode Island**

278.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Rhode Island Unfair Trade Practice and Consumer Protection Act, R.I. Gen. Laws § 6-13.1-1, *et seq.* Members of the Damages Class purchased generic Digoxin for personal, family, or household purposes. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Rhode Island, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Digoxin were sold, distributed, or obtained in Rhode Island. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Digoxin. Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business purchaser, Defendants breached that duty by their silence.

135

Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Digoxin prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Digoxin price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) generic Digoxin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Rhode Island; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Digoxin. Defendants' illegal conduct substantially affected Rhode Island commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Digoxin, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Digoxin at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Digoxin they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Rhode Island Gen. Laws. § 6-13.1-1, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

136

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**South Carolina**

279.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of South Carolina Unfair Trade Practices Act, S.C. Code Ann. § 39-5-10, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Digoxin price competition was restrained, suppressed, and eliminated throughout South Carolina; (2) generic Digoxin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Digoxin. During the Class Period, Defendants' illegal conduct had a substantial effect on South Carolina commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. § 39-5-10, *et seq*., and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

**South Dakota**

280.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the South Dakota Deceptive Trade Practices and Consumer Protection Statute, S.D. Codified Laws § 37-24-1, *et seq*.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in South Dakota, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Digoxin were sold, distributed, or obtained in South Dakota. Defendants deliberately

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Digoxin. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Digoxin prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Digoxin price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) generic Digoxin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Digoxin. Defendants' illegal conduct substantially affected South Dakota commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Digoxin, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Digoxin at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Digoxin they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Codified Laws § 37-24-1, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Utah**

281.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Utah Consumer Sales Practices Act, Ut. Stat. § 13-11-1, *et seq*.  Members of the Damages Class purchased generic Digoxin for personal, family, or household purposes. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Utah, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Digoxin were sold, distributed, or obtained in Utah. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Digoxin. Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business purchaser, Defendants breached that duty by their silence. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Digoxin prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Digoxin price competition was restrained, suppressed, and eliminated throughout Utah; (2) generic Digoxin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Utah; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Digoxin. Defendants' illegal conduct substantially affected Utah commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set

139

forth above and are threatened with further injury. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Digoxin, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Digoxin at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Digoxin they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ut. Stat. § 13-11-1 *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute and as equity demands.

**Vermont**

282.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of 9 Vermont Statutes § 2451, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Vermont, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Digoxin were sold, distributed, or obtained in Vermont. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Digoxin. Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business purchaser, Defendants breached that duty by their silence. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Digoxin prices were competitive and fair. Defendants' unlawful conduct had the following

140

effects: (1) generic Digoxin price competition was restrained, suppressed, and eliminated throughout Vermont; (2) generic Digoxin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Digoxin. During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Digoxin, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Digoxin at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitutes unfair competition or unfair or deceptive acts or practices in violation of 9 Vt. Stat. § 2451, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Virginia**

283.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Virginia Consumer Protection Act of 1977, Va. Code § 59.1-196, *et seq*.  Members of the Damages Class purchased generic Digoxin to be used for personal, family, or household purposes. Defendants agreed to, and did in fact, act in restraint

141

of trade or commerce in a market that includes Virginia, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Digoxin were sold, distributed, or obtained in Virginia. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Digoxin. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Digoxin prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Digoxin price competition was restrained, suppressed, and eliminated throughout Virginia; (2) generic Digoxin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Virginia; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Digoxin. Defendants' illegal conduct substantially affected Virginia commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Digoxin, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Digoxin at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Digoxin they purchased. Defendants have engaged in unfair competition or unfair or deceptive

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

acts or practices in violation of Va. Code § 59.1-196, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**West Virginia**

284.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the West Virginia Consumer Credit and Protection Act, W.Va. Code § 46A-6-101, *et seq*.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes West Virginia, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Digoxin were sold, distributed, or obtained in West Virginia. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Digoxin. Defendants affirmatively misrepresented to all purchasers during the Class Period that Defendants' generic Digoxin prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Digoxin price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) generic Digoxin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout West Virginia; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Digoxin. Defendants' illegal conduct substantially affected West Virginia commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful

143

and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Digoxin, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Digoxin at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Digoxin they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of W.Va. Code § 46A-6-101, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Wisconsin**

285.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Wisconsin Consumer Protection Statutes, Wisc. Stat. § 100.18, *et seq.*  Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Wisconsin, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Digoxin were sold, distributed, or obtained in Wisconsin. Defendants affirmatively misrepresented to all purchasers during the Class Period that Defendants' generic Digoxin prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Digoxin price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) generic Digoxin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Wisconsin; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated

144

prices for generic Digoxin. Defendants' illegal conduct substantially affected Wisconsin commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations concerning the price of generic Digoxin, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Digoxin at prices set by a free and fair market. Defendants' affirmative misrepresentations constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Digoxin they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wisc. Stat. § 100.18, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**U.S. Virgin Islands**

286.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the U.S. Virgin Islands Consumer Fraud and Deceptive Business Practices Act, 12A V.I.C. §§ 102, 301-35, *et seq*.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes U.S.V.I., by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Digoxin were sold, distributed, or obtained in U.S.V.I. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Digoxin. Defendants affirmatively

145

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

misrepresented to all purchasers during the Class Period that Defendants' generic Digoxin prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Digoxin price competition was restrained, suppressed, and eliminated throughout U.S.V.I.; (2) generic Digoxin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout U.S.V.I.; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Digoxin. Defendants' illegal conduct substantially affected U.S.V.I. commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above and are threatened with further injury. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Digoxin, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Digoxin at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Digoxin they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 12A V.I.C. §§ 102, 301-35, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute and as equity demands.

146

## FOURTH COUNT

### Unjust Enrichment[112]
### (on behalf of Plaintiffs and the Damages Class)

287.    Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

288.    To the extent required, this claim is pleaded in the alternative to the other claims in this Complaint.

289.    Defendants have unlawfully benefited from their sales of Digoxin because of the unlawful and inequitable acts alleged in this Complaint. Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Digoxin at prices that were more than they would have been but for Defendants' unlawful actions.

290.    Defendants' financial benefits resulting from their unlawful and inequitable acts are traceable to overpayments by Plaintiffs and the Damages Class.

291.    Plaintiffs and the Damages Class have conferred upon Defendants an economic benefit, in the nature of profits resulting from unlawful overcharges, to the economic detriment of Plaintiffs and the Damages Class.

292.    Defendants have been enriched by revenue resulting from unlawful overcharges for Digoxin while Plaintiffs and the Damages Class have been impoverished by the overcharges they paid for Digoxin imposed through Defendants' unlawful conduct. Defendants' enrichment and Plaintiffs' and the Damages Class's impoverishment are connected.

---

[112] Unjust enrichment claims are alleged herein under the laws of all States (except Ohio and Indiana) as well as the District of Columbia, Puerto Rico and the U.S. Virgin Islands.

147

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

293.    There is no justification for Defendants' retention of, and enrichment from, the benefits they received, which caused impoverishment to Plaintiffs and the Damages Class, because Plaintiffs and the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.

294.    Plaintiffs and the Damages Class did not interfere with Defendants' affairs in any manner that conferred these benefits upon Defendants.

295.    The benefits conferred upon Defendants were not gratuitous, in that they constituted revenue created by unlawful overcharges arising from Defendants' illegal and unfair actions to inflate the prices of Digoxin.

296.    The benefits conferred upon Defendants are measurable, in that the revenue Defendants have earned due to their unlawful overcharges of Digoxin are ascertainable by review of sales records.

297.    It would be futile for Plaintiffs and the Damages Class to seek a remedy from any party with whom they have privity of contract. Defendants have paid no consideration to any other person for any of the unlawful benefits they received indirectly from Plaintiffs and the Damages Class with respect to Defendants' sales of Digoxin.

298.    It would be futile for Plaintiffs and the Damages Class to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which they indirectly purchased Digoxin, as the intermediaries are not liable and cannot reasonably be expected to compensate Plaintiffs and the Damages Class for Defendants' unlawful conduct.

148

299.    The economic benefit of overcharges and monopoly profits derived by Defendants through charging supracompetitive and artificially inflated prices for Digoxin is a direct and proximate result of Defendants' unlawful practices.

300.    The financial benefits derived by Defendants rightfully belong to Plaintiffs and the Damages Class, because Plaintiffs and the Damages Class paid supracompetitive prices during the Class Period, inuring to the benefit of Defendants.

301.    It would be inequitable under unjust enrichment principles under the laws of all States (except Ohio and Indiana) and of the District of Columbia, Puerto Rico and the U.S. Virgin Islands, for Defendants to be permitted to retain any of the overcharges for Digoxin derived from Defendants' unlawful, unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

302.    Defendants are aware of and appreciate the benefits bestowed upon them by Plaintiffs and the Damages Class. Defendants consciously accepted the benefits and continue to do so as of the date of this filing.

303.    Defendants should be compelled to disgorge in a common fund for the benefit of Plaintiffs and the Damages Class all unlawful or inequitable proceeds they received from their sales of Digoxin.

304.    A constructive trust should be imposed upon all unlawful or inequitable sums received by Defendants traceable to indirect purchases of Digoxin by Plaintiffs and the Damages Class.

305.    Plaintiffs and the Damages Class have no adequate remedy at law.

149

306.     By engaging in the foregoing unlawful or inequitable conduct depriving Plaintiffs and the Damages Class of the opportunity to purchase lower-priced generic versions of Digoxin and forcing them to pay higher prices for Digoxin, Defendants have been unjustly enriched in violation of the common law of various states, as outlined below:

**Alabama**

307.     Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Digoxin in Alabama at prices that were more than they would have been but for Defendants' actions.  Defendants received money from Plaintiffs and the Damages Class as a direct result of the unlawful overcharges, and have retained this money. Defendants have benefitted at the expense of Plaintiffs and the Damages Class from revenue resulting from unlawful overcharges for Digoxin.  It is inequitable for Defendants to accept and retain the benefits received without compensating Plaintiffs and the Damages Class.

**Alaska**

308.     Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Digoxin in Alaska at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefits bestowed upon them by Plaintiffs and the Damages Class. Defendants accepted and retained the benefits bestowed upon them under inequitable and unjust circumstances arising from unlawful overcharges to Plaintiffs and the Damages Class.   Under the circumstances, it would be

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Arizona**

309.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Digoxin in Arizona at prices that were more than they would have been but for Defendants' actions. Defendants have been enriched by revenue resulting from unlawful overcharges for Digoxin. Plaintiffs and the Damages Class have been impoverished by the overcharges for Digoxin resulting from Defendants' unlawful conduct.  Defendants' enrichment and Plaintiffs' and the Damages Class's impoverishment are connected.  There is no justification for Defendants' receipt of the benefits causing their enrichment and Plaintiffs' and the Damages Class's impoverishment, because Plaintiffs and the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.  Plaintiffs and the Damages Class have no remedy at law.

**Arkansas**

310.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Digoxin in Arkansas at prices that were more than they would have been but for Defendants' actions.  Defendants received money from Plaintiffs and the Damages Class as a direct result of the unlawful overcharges, and have retained this money. Defendants have paid no consideration to any other person in exchange for this money.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**California**

311.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Digoxin in California at prices that were more than they would have been but for Defendants' actions.  Defendants have received a benefit from Plaintiffs and the Damages Class as a direct result of the unlawful overcharges.  Defendants retained the benefits bestowed upon them under inequitable and unjust circumstances at the expense of Plaintiffs and the Damages Class.

**Colorado**

312.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Digoxin in Colorado at prices that were more than they would have been but for Defendants' actions.  Defendants have received a benefit from Plaintiffs and the Damages Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants.  Defendants have benefitted at the expense of Plaintiffs and the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Connecticut**

313.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Digoxin in Connecticut at prices that were more than they would have been but for Defendants' actions.  Defendants were benefitted in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class. Defendants have paid no consideration to any other person in exchange for this benefit.

152

Defendants retained the benefits bestowed upon them under inequitable and unjust circumstances at the expense of Plaintiffs and the Damages Class.

**Delaware**

314.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Digoxin in Delaware at prices that were more than they would have been but for Defendants' actions.   Defendants have been enriched by revenue resulting from unlawful overcharges for Digoxin.   Plaintiffs and the Damages Class have been impoverished by the overcharges for Digoxin resulting from Defendants' unlawful conduct.   Defendants' enrichment and Plaintiffs' and the Damages Class's impoverishment are connected.   There is no justification for Defendants' receipt of the benefits causing their enrichment, because Plaintiffs and the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges. Plaintiffs and the Damages Class have no remedy at law.

**District of Columbia**

315.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Digoxin in the District of Columbia at prices that were more than they would have been but for Defendants' actions.   Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.   Defendants retained the benefit bestowed upon them under inequitable and unjust circumstances arising from unlawful overcharges to Plaintiffs and the Damages Class.    Under the circumstances, it would be inequitable and unjust for Defendants to retain such benefits.

153

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Florida**

316.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Digoxin in Florida at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefits bestowed upon them by Plaintiffs and the Damages Class.   Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Georgia**

317.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Digoxin in Georgia at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Hawaii**

318.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Digoxin in Hawaii at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic

154

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

detriment of Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Idaho**

319.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Digoxin in Idaho at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefit conferred upon them by Plaintiffs and the Damages Class.   Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Illinois**

320.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Digoxin in Illinois at prices that were more than they would have been but for Defendants' actions. Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants retained the benefits bestowed upon them under unjust circumstances arising from unlawful overcharges to Plaintiffs and the Damages Class.  It is against equity, justice, and good conscience for Defendants to be permitted to retain the revenue resulting from their unlawful overcharges.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Iowa**

321.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Digoxin in Iowa at prices that were more than they would have been but for Defendants' actions.   Defendants have been enriched by revenue resulting from unlawful overcharges for Digoxin, which revenue resulted from anticompetitive prices paid by Plaintiffs and the Damages Class, which inured to Defendants' benefit.   Defendants' enrichment has occurred at the expense of Plaintiffs and the Damages Class.   Under the circumstances, it would be unjust for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Kansas**

322.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Digoxin in Kansas at prices that were more than they would have been but for Defendants' actions.   Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.   Defendants retained the benefits bestowed upon them under unjust circumstances arising from unlawful overcharges to Plaintiffs and the Damages Class.   Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Kentucky**

323.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Digoxin in Kentucky at prices that were more than they would have been but for Defendants' actions.   Plaintiffs and the Damages Class have conferred an economic benefit

156

upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefit conferred upon them by Plaintiffs and the Damages Class.   Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Louisiana**

324.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Digoxin in Louisiana at prices that were more than they would have been but for Defendants' actions.  Defendants have been enriched by revenue resulting from unlawful overcharges for Digoxin.  Plaintiffs and the Damages Class have been impoverished by the overcharges for Digoxin resulting from Defendants' unlawful conduct.  Defendants' enrichment and Plaintiffs' and the Damages Class's impoverishment are connected.  There is no justification for Defendants' receipt of the benefits causing their enrichment, because Plaintiffs and the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges. Plaintiffs and the Damages Class have no other remedy at law.

**Maine**

325.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Digoxin in Maine at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants were aware of or appreciated the

157

benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Maryland**

326.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Digoxin in Maryland at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants were aware of or appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Massachusetts**

327.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Digoxin in Massachusetts at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants were aware of or appreciated the benefit conferred upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Michigan**

328.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Digoxin in Michigan at prices that were more than they would have been but for Defendants' actions.  Defendants have received a benefit from Plaintiffs and the Damages Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants.  Defendants retained the benefits bestowed upon them under unjust circumstances arising from unlawful overcharges to Plaintiffs and the Damages Class.   Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Minnesota**

329.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Digoxin in Minnesota at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated and knowingly accepted the benefits bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Mississippi**

330.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Digoxin in Mississippi at prices that were more than they would have been but for Defendants' actions.  Defendants received money from Plaintiffs and the Damages Class

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

as a direct result of the unlawful overcharges. Defendants retain the benefit of overcharges received on the sales of Digoxin, which in equity and good conscience belong to Plaintiffs and the Damages Class on account of Defendants' anticompetitive conduct. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Missouri**

331.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Digoxin in Missouri at prices that were more than they would have been but for Defendants' actions. Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class. Defendants appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class. Defendants accepted and retained the benefit bestowed upon them under inequitable and unjust circumstances arising from unlawful overcharges to Plaintiffs and the Damages Class.

**Montana**

332.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Digoxin in Montana at prices that were more than they would have been but for Defendants' actions. Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Nebraska**

333.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Digoxin in Nebraska at prices that were more than they would have been but for Defendants' actions.  Defendants received money from Plaintiffs and the Damages Class as a direct result of the unlawful overcharges, and have retained this money. Defendants have paid no consideration to any other person in exchange for this money.   In justice and fairness, Defendants should disgorge such money and remit the overcharged payments back to Plaintiffs and the Damages Class.

**Nevada**

334.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Digoxin in Nevada at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants in the nature of revenue resulting from unlawful overcharges for Digoxin. Defendants appreciated the benefits bestowed upon them by Plaintiffs and the Damages Class, for which they have paid no consideration to any other person.   Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**New Hampshire**

335.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Digoxin in New Hampshire at prices that were more than they would have been but for Defendants' actions.  Defendants have received a benefit from Plaintiffs and the Damages Class in the nature of revenue resulting from the unlawful overcharges, which revenue

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

resulted from anticompetitive prices that inured to the benefit of Defendants.   Under the circumstances, it would be unconscionable for Defendants to retain such benefits.

**New Jersey**

336.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Digoxin in New Jersey at prices that were more than they would have been but for Defendants' actions.  Defendants have received a benefit from Plaintiffs and the Damages Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants.   The benefits conferred upon Defendants were not gratuitous, in that they comprised revenue created by unlawful overcharges arising from arising from unlawful overcharges to Plaintiffs and the Damages Class. Defendants have paid no consideration to any other person for any of the unlawful benefits they received from Plaintiffs and the Damages Class with respect to Defendants' sales of Digoxin. Under the circumstances, it would be unjust for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**New Mexico**

337.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Digoxin in New Mexico at prices that were more than they would have been but for Defendants' actions.  Defendants have knowingly benefitted at the expense of Plaintiffs and the Damages Class from revenue resulting from unlawful overcharges for Digoxin.   To allow Defendants to retain the benefits would be unjust because the benefits resulted from anticompetitive pricing that inured to Defendants' benefit and because Defendants have paid no consideration to any other person for any of the benefits they received.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**New York**

338.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Digoxin in New York at prices that were more than they would have been but for Defendants' actions.  Defendants have been enriched by revenue resulting from unlawful overcharges for Digoxin, which revenue resulted from anticompetitive prices paid by Plaintiffs and the Damages Class, which inured to Defendants' benefit.  Defendants' enrichment has occurred at the expense of Plaintiffs and the Damages Class.  It is against equity and good conscience for Defendants to be permitted to retain the revenue resulting from their unlawful overcharges.

**North Carolina**

339.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Digoxin in North Carolina at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Plaintiffs and the Damages Class did not interfere with Defendants' affairs in any manner that conferred these benefits upon Defendants.  The benefits conferred upon Defendants were not gratuitous, in that they comprised revenue created by unlawful overcharges arising from arising from unlawful overcharges to Plaintiffs and the Damages Class.  The benefits conferred upon Defendants are measurable, in that the revenue Defendants have earned due to unlawful overcharges are ascertainable by review of sales records.  Defendants consciously accepted the benefits conferred upon them.

163

**North Dakota**

340.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Digoxin in North Dakota at prices that were more than they would have been but for Defendants' actions. Defendants have been enriched by revenue resulting from unlawful overcharges for Digoxin.  Plaintiffs and the Damages Class have been impoverished by the overcharges for Digoxin resulting from Defendants' unlawful conduct.  Defendants' enrichment and Plaintiffs' and the Damages Class's impoverishment are connected.  There is no justification for Defendants' receipt of the benefits causing their enrichment, because Plaintiffs and the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges. Plaintiffs and the Damages Class have no remedy at law.  Under the circumstances, it would be unjust for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Oklahoma**

341.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Digoxin in Oklahoma at prices that were more than they would have been but for Defendants' actions.  Defendants received money from Plaintiffs and the Damages Class as a direct result of the unlawful overcharges, and have retained this money. Defendants have paid no consideration to any other person in exchange for this money.  Plaintiffs and the Damages Class have no remedy at law.  It is against equity and good conscience for Defendants to be permitted to retain the revenue resulting from their unlawful overcharges.

164

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Oregon**

342.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Digoxin in Oregon at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants were aware of the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be unjust for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Pennsylvania**

343.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Digoxin in Pennsylvania at prices that were more than they would have been but for Defendants' actions. Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Puerto Rico**

344.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Digoxin in Puerto Rico at prices that were more than they would have been but for Defendants' actions.  Defendants have been enriched by revenue resulting from unlawful overcharges for Digoxin.  Plaintiffs and the Damages Class have been impoverished by the

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

overcharges for Digoxin resulting from Defendants' unlawful conduct.  Defendants' enrichment and Plaintiffs' and the Damages Class's impoverishment are connected.  There is no justification for Defendants' receipt of the benefits causing their enrichment and Plaintiffs' and the Damages Class's impoverishment, because Plaintiffs and the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.  Plaintiffs and the Damages Class have no remedy at law.

**Rhode Island**

345.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Digoxin in Rhode Island at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**South Carolina**

346.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Digoxin in South Carolina at prices that were more than they would have been but for Defendants' actions.  The benefits conferred upon Defendants were not gratuitous, in that they comprised revenue created by unlawful overcharges arising from arising from unlawful overcharges to Plaintiffs and the Damages Class.  Defendants realized value from the

166

benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**South Dakota**

347.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Digoxin in South Dakota at prices that were more than they would have been but for Defendants' actions.  Defendants have received a benefit from Plaintiffs and the Damages Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants.  Defendants were aware of the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable and unjust for Defendants to retain such benefits without reimbursing Plaintiffs and the Damages Class.

**Tennessee**

348.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Digoxin in Tennessee at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.  It would be futile for Plaintiffs and the Damages Class to seek a remedy from any party with whom they have privity of contract. Defendants have paid no consideration to any

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

other person for any of the unlawful benefits they received indirectly from Plaintiffs and the Damages Class with respect to Defendants' sales of Digoxin. It would be futile for Plaintiffs and the Damages Class to exhaust all remedies against the entities with which Plaintiffs and the Damages Class have privity of contract because Plaintiffs and the Damages Class did not purchase Digoxin directly from any Defendant.

**Texas**

349.  Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Digoxin in Texas at prices that were more than they would have been but for Defendants' actions. Defendants have received a benefit from Plaintiffs and the Damages Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants. Defendants were aware of or appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class. The circumstances under which Defendants have retained the benefits bestowed upon them by Plaintiffs and the Damages Class are inequitable in that they result from Defendants' unlawful overcharges for Digoxin. Plaintiffs and the Damages Class have no remedy at law.

**Utah**

350.  Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Digoxin in Utah at prices that were more than they would have been but for Defendants' actions. Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class. Defendants were aware of or appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class. Under the circumstances, it

168

would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Vermont**

351.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Digoxin in Vermont at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants accepted the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Virginia**

352.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Digoxin in Virginia at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants were aware of the benefit bestowed upon them.  Defendants should reasonably have expected to repay Plaintiffs and the Damages Class. The benefits conferred upon Defendants were not gratuitous, in that they constituted revenue created by unlawful overcharges arising from Defendants' illegal and unfair actions to inflate the prices of Digoxin.  Defendants have paid no consideration to any other person for any of the benefits they have received from Plaintiffs and the Damages Class.

169

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Washington**

353.     Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Digoxin in Washington at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants were aware of or appreciated the benefit conferred upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**West Virginia**

354.     Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Digoxin in West Virginia at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants were aware of or appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Wisconsin**

355.     Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Digoxin in Wisconsin at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic

170

benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class. Defendants appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Wyoming**

356.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Digoxin in Wyoming at prices that were more than they would have been but for Defendants' actions. Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class. Defendants accepted, used and enjoyed the benefits bestowed upon them by Plaintiffs and the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**U.S. Virgin Islands**

357.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Digoxin in the United States Virgin Islands at prices that were more than they would have been but for Defendants' actions. Defendants have been enriched by revenue resulting from unlawful overcharges for Digoxin, which revenue resulted from anticompetitive prices paid by Plaintiffs and the Damages Class, which inured to Defendants' benefit. Defendants' enrichment has occurred at the expense of Plaintiffs and the Damages Class. Defendants appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class. It

171

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

is against equity and good conscience for Defendants to be permitted to retain the revenue resulting from their unlawful overcharges.  Plaintiffs and the Damages Class have no remedy at law.

## XV.   **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment for the following relief:

1.      The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable Notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Class;

2.      That the unlawful conduct, contract, conspiracy, or combination alleged herein be adjudged and decreed: (a) an unreasonable restraint of trade or commerce in violation of Sections 1 and 3 of the Sherman Act; (b) a *per se* violation of Sections 1 and 3 of the Sherman Act; (c) an unlawful combination, trust, agreement, understanding and/or concert of action in violation of the state antitrust and unfair competition and consumer protection laws as set forth herein; and (d) acts of unjust enrichment by Defendants as set forth herein.

3.      Plaintiffs and members of the Damages Class recover damages, to the maximum extent allowed under such state laws, and that a judgment in favor of Plaintiffs and members of the Damages Class be entered against Defendants jointly and severally in an amount to be trebled to the extent such laws permit;

4.      Plaintiffs and members of the Damages Class recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully obtained;

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

5.      Plaintiffs and members of the Damages Class be awarded restitution, including disgorgement of profits Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment, and the Court establish of a constructive trust consisting of all ill-gotten gains from which Plaintiffs and members of the Damages Class may make claims on a *pro rata* basis;

6.      Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

7.      Plaintiffs and members of the Classes be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate;

8.      Plaintiffs and members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

9.      Plaintiffs and members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

## XVI.    JURY DEMAND

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil

Procedure, of all issues so triable.

June 25, 2019                                    Respectfully submitted,


                                                 Roberta D. Liebenberg, Esquire
                                                 Fine, Kaplan and Black, R.P.C.
                                                 One South Broad Street, 23rd Floor
                                                 Philadelphia, PA  19107
                                                 (215) 567-6565
                                                 rliebenberg@finekaplan.com

                                                 **Lead Counsel for the End-Payer Plaintiffs**

Gregory S. Asciolla, Esquire          Michael M. Buchman, Esquire
Labaton Sucharow LLP                  Motley Rice LLC
140 Broadway                          600 Third Avenue, Suite 2101
New York, NY  10005                   New York, NY  10016
(212) 907-0700                        (212) 577-0040
gasciolla@labaton.com                 mbuchman@motleyrice.com

Elizabeth J. Cabraser, Esquire        James R. Dugan, II, Esquire
Lieff Cabraser Heimann & Bernstein LLP The Dugan Law Firm, APLC
275 Battery Street, 29th Floor        365 Canal Street, Suite 1000
San Francisco, CA  94111-3339         New Orleans, LA 70130
(415) 956-1000                        (504) 648-0180
ecabraser@lchb.com                    jdugan@dugan-lawfirm.com

Jayne A. Goldstein, Esquire           Mindee J. Reuben, Esquire
Shepherd Finkelman Miller & Shah, LLP Lite DePalma Greenberg, LLC
1625 N. Commerce Parkway, Suite 320   1835 Market Street, 27th Floor
Fort Lauderdale, FL 33326             Philadelphia, PA  19103
(886) 849-7545                        (267) 314-7980
jgoldstein@sfmslaw.com                mreuben@litedepalma.com

Joseph R. Saveri, Esquire             Dena C. Sharp, Esquire
Joseph Saveri Law Firm, Inc.          Girard Sharp LLP
555 Montgomery Street, Suite 1210     601 California Street, Suite 1400

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

San Francisco, CA  94111
(415) 500-6800
jsaveri@saverilawfirm.com

Heidi M. Silton, Esquire
Lockridge Grindal Nauen P.L.L.P.
100 Washington Avenue South
Suite 2200
Minneapolis, MN  55401
(612) 339-6900
hmsilton@locklaw.com

Adam J. Zapala, Esquire
Cotchett, Pitre & McCarthy, LLP
840 Malcolm Road, Suite 200
Burlingame, CA  94010
(650) 697-6000
azapala@cpmlegal.com

San Francisco, CA 94108
(415) 981-4800
chc@girardsharp.com

Bonny E. Sweeney, Esquire
Hausfeld LLP
600 Montgomery Street, Suite 3200
San Francisco, CA  94111
(415) 633-1908
bsweeney@hausfeld.com

**End-Payer Plaintiffs' Steering Committee**

Audrey A. Browne, Esquire
American Federation of State, County and
   Municipal Employees District Council 37
   Health & Security Plan
125 Barclay Street, Room 313
New York, NY 10007
(212) 815-1304
abrowne@dc37.net

**Attorneys for Plaintiff American
Federation of State, County and
Municipal Employees District
Council 37 Health & Security Plan**

Joseph Gentile, Esquire
Sarraf Gentile LLP
14 Bond Street, Suite 212
Great Neck, New York 11021
(516) 699-8890
joseph@sarrafgentile.com

**Attorneys for Nina Diamond**

Jeffrey B. Gittleman, Esquire
Barrack, Rodos & Bacine
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
(215) 963-0600
jgittleman@barrack.com

**Additional End-Payer Plaintiffs' Counsel**

175

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER